# METRO BROADCASTING, INC. *v.* FEDERAL COMMUNICATIONS COMMISSION ET AL.

No. 89–453.   Argued March 28, 1990—Decided June 27, 1990*

---

*Together with No. 89–700, *Astroline Communications Company Limited Partnership* v. *Shurberg Broadcasting of Hartford, Inc., et al.,* also on certiorari to the same court.

548

550

BRENNAN, J., delivered the opinion of the Court, in which WHITE, MAR-SHALL, BLACKMUN, and STEVENS, JJ., joined. STEVENS, J., filed a con-curring opinion, *post*, p. 601. O'CONNOR, J., filed a dissenting opinion, in which REHNQUIST, C. J., and SCALIA and KENNEDY, JJ., joined, *post*, p. 602. KENNEDY, J., filed a dissenting opinion, in which SCALIA, J., joined, *post*, p. 631.

*Gregory H. Guillot* argued the cause for petitioner in No. 89–453. With him on the briefs was *John H. Midlen, Jr. J. Roger Wollengerg* argued the cause for petitioner in No. 89–700. On the briefs were *Lee H. Simowitz* and *Linda R. Bocchi.*

*Daniel M. Armstrong* argued the cause for the federal respondent in No. 89–453. With him on the brief were *Robert L. Pettit* and *C. Grey Pash, Jr. Margot Polivy* argued the cause for respondent Rainbow Broadcasting Co. With her on the brief was *Katrina Renouf. Harry F. Cole* argued the cause for respondents in No. 89–700 and filed a brief for respondent Shurberg Broadcasting of Hartford, Inc. *Robert L. Pettit, Daniel M. Armstrong,* and *C. Grey Pash, Jr.,* filed a brief for the Federal Communications Commission, as respondent under this Court's Rule 12.4, in support of petitioner in No. 89–700.†

---

†Briefs of *amici curiae* urging reversal in No. 89–453 were filed for the United States by *Acting Solicitor General Roberts, Acting Assistant Attorney General Turner, Deputy Solicitor General Merrill, Deputy Assistant Attorney General Clegg,* and *Michael R. Lazerwitz;* for Associated General Contractors of America, Inc., by *Charles J. Cooper, Michael A. Carvin,* and *Michael E. Kennedy;* for Galaxy Communications, Inc., by *Ronald D. Maines;* for the Mountain States Legal Foundation et al. by *William Perry Pendley;* for the Pacific Legal Foundation by *Ronald A. Zumbrun, Anthony T. Caso,* and *Sharon L. Browne;* and for the Washington Legal Foundation by *Glen D. Nager, Patricia A. Dunn, Daniel J. Popeo, Paul D. Kamenar,* and *John C. Scully. Vincent A. Pepper* and *Louis C. Stephens* filed a brief for the Committee to Promote Diversity as *amicus curiae* urging reversal in No. 89–700.

Brief of *amici curiae* urging affirmance in No. 89–453 and reversal in No. 89–700 were filed for the American Civil Liberties Union by *Burt Neuborne, Steven R. Shapiro, John A. Powell,* and *Sarah E. Burns;* for the Congressional Black Caucus by *David E. Honig, Squire Padgett,* and *George W. Jones, Jr.;* for the National Association of Black Owned Broadcasters, Inc., by *Walter E. Diercks, James L. Winston,* and *Lois E. Wright;* and for the National Bar Association by *J. Clay Smith, Jr.*

Briefs of *amici curiae* urging affirmance in No. 89–453 were filed for the United States Senate by *Michael Davidson, Ken U. Benjamin, Jr.,* and *Morgan J. Frankel;* for the American Jewish Committee et al. by *Angela*

JUSTICE BRENNAN delivered the opinion of the Court.

The issue in these cases, consolidated for decision today, is whether certain minority preference policies of the Federal Communications Commission violate the equal protection component of the Fifth Amendment. The policies in question are (1) a program awarding an enhancement for minority ownership in comparative proceedings for new licenses, and (2) the minority "distress sale" program, which permits a limited category of existing radio and television broadcast stations to be transferred only to minority-controlled firms. We hold that these policies do not violate equal protection principles.

## I

### A

The policies before us today can best be understood by reference to the history of federal efforts to promote minority

*J. Campbell, Andrew Jay Schwartzman,* and *Elliot Mincberg;* for Capital Cities/ABC, Inc., by *J. Roger Wollenberg, Carl Willner,* and *Stephen A. Weiswasser;* for Cook Inlet Region, Inc., et al. by *Vernon E. Jordan, Jr.,* and *Daniel Joseph;* for Giles Television, Inc., by *Douglas B. McFadden* and *Donald J. Evans;* for the Lawyers' Committee for Civil Rights Under Law by *John Payton, Mark S. Hersh, Robert F. Mullen, David S. Tatel,* and *Norman Redlich;* for the NAACP Legal Defense & Educational Fund, Inc., by *Julius L. Chambers, Charles Stephen Ralston, Ronald L. Ellis, Eric Schnapper, Clyde E. Murphy,* and *Nolan A. Bowie;* and for the National League of Cities et al. by *Benna Ruth Solomon* and *Richard A. Simpson.*

Briefs of *amici curiae* urging affirmance in No. 89–700 were filed for the United States by *Acting Solicitor General Roberts, Acting Assistant Attorney General Turner, Deputy Solicitor General Merrill, Deputy Assistant Attorney General Clegg,* and *Michael R. Lazerwitz;* for the Pacific Legal Foundation by *Ronald A. Zumbrun, Anthony T. Caso,* and *Sharon L. Browne;* and for Southeastern Legal Foundation, Inc., by *Robert L. Barr, Jr.,* and *G. Stephen Parker.*

Briefs of *amici curiae* in No. 89–453 were filed for American Women in Radio and Television, Inc., by *Richard P. Holme;* and for Jerome Thomas Lamprecht by *Michael P. McDonald.*

participation in the broadcasting industry.[1]  In the Communications Act of 1934, 48 Stat. 1064, as amended, Congress assigned to the Federal Communications Commission (FCC or Commission) exclusive authority to grant licenses, based on "public convenience, interest, or necessity," to persons wishing to construct and operate radio and television broadcast stations in the United States.  See 47 U. S. C. §§ 151, 301, 303, 307, 309 (1982 ed.).  Although for the past two decades minorities have constituted at least one-fifth of the United States population, during this time relatively few members of minority groups have held broadcast licenses. In 1971, minorities owned only 10 of the approximately 7,500 radio stations in the country and none of the more than 1,000 television stations, see *TV 9, Inc.* v. *FCC*, 161 U. S. App. D. C. 349, 357, n. 28, 495 F. 2d 929, 937, n. 28 (1973), cert. denied, 419 U. S. 986 (1974); see also 1 U. S. Commission on Civil Rights, Federal Civil Rights Enforcement Effort — 1974, p. 49 (Nov. 1974); in 1978, minorities owned less than 1 percent of the Nation's radio and television stations, see FCC Minority Ownership Task Force, Report on Minority Ownership in Broadcasting 1 (1978) (hereinafter Task Force Report); and in 1986, they owned just 2.1 percent of the more than 11,000 radio and television stations in the United States. See National Association of Broadcasters, Minority Broadcasting Facts 6 (Sept. 1986).  Moreover, these statistics fail to reflect the fact that, as late entrants who often have been able to obtain only the less valuable stations, many minority

---

[1] The FCC has defined the term "minority" to include "those of Black, Hispanic Surnamed, American Eskimo, Aleut, American Indian and Asiatic American extraction." *Statement of Policy on Minority Ownership of Broadcasting Facilities*, 68 F. C. C. 2d 979, 980, n. 8 (1978).  See also *Commission Policy Regarding Advancement of Minority Ownership in Broadcasting*, 92 F. C. C. 2d 849, 849, n. 1 (1982), citing 47 U. S. C. § 309(i)(3)(C) (1982 ed.).

broadcasters serve geographically limited markets with relatively small audiences.[2]

The Commission has recognized that the viewing and listening public suffers when minorities are underrepresented among owners of television and radio stations:

> "Acute underrepresentation of minorities among the owners of broadcast properties is troublesome because it is the licensee who is ultimately responsible for identifying and serving the needs and interests of his or her audience. Unless minorities are encouraged to enter the mainstream of the commercial broadcasting business, a substantial portion of our citizenry will remain underserved and the larger, non-minority audience will be deprived of the views of minorities." Task Force Report 1.

The Commission has therefore worked to encourage minority participation in the broadcast industry. The FCC began by formulating rules to prohibit licensees from discriminating against minorities in employment.[3] The FCC explained that "broadcasting is an important mass media form which, because it makes use of the airwaves belonging to the public, must obtain a Federal license under a public interest standard and must operate in the public interest in order to obtain periodic renewals of that license." *Nondiscrimination Employment Practices of Broadcast Licensees*, 13 F. C. C. 2d 766, 769 (1968). Regulations dealing with employment practices were justified as necessary to enable the FCC to satisfy

---

[2] See Task Force Report 1; Wimmer, Deregulation and Market Failure in Minority Programming: The Socioeconomic Dimensions of Broadcast Reform, 8 Comm/Ent L. J. 329, 426, n. 516 (1986). See also n. 46, *infra*.

[3] See, *e. g., Nondiscrimination Employment Practices of Broadcast Licensees*, 18 F. C. C. 2d 240 (1969); *Nondiscrimination Employment Practices of Broadcast Licensees*, 23 F. C. C. 2d 430 (1970); *Nondiscrimination in Employment Policies and Practices of Broadcast Licensees*, 54 F. C. C. 2d 354 (1975); *Nondiscrimination in Employment Policies and Practices of Broadcast Licensees*, 60 F. C. C. 2d 226 (1976). The FCC's current equal employment opportunity policy is outlined at 47 CFR § 73.2080 (1989).

its obligation under the Communications Act of 1934 to promote diversity of programming. See *NAACP* v. *FPC*, 425 U. S. 662, 670, n. 7 (1976). The United States Department of Justice, for example, contended that equal employment opportunity in the broadcast industry could "'contribute significantly toward reducing and ending discrimination in other industries'" because of the "'enormous impact which television and radio have upon American life.'" *Nondiscrimination Employment Practices, supra,* at 771 (citation omitted).

Initially, the FCC did not consider minority status as a factor in licensing decisions, maintaining as a matter of Commission policy that no preference to minority ownership was warranted where the record in a particular case did not give assurances that the owner's race likely would affect the content of the station's broadcast service to the public. See *Mid-Florida Television Corp.,* 33 F. C. C. 2d 1, 17–18 (Rev. Bd.), review denied, 37 F. C. C. 2d 559 (1972), rev'd, *TV 9, Inc.* v. *FCC, supra.* The Court of Appeals for the District of Columbia Circuit, however, rejected the Commission's position that an "assurance of superior community service attributable to . . . Black ownership and participation" was required before a preference could be awarded. *TV 9, Inc., supra,* at 358, 495 F. 2d, at 938. "'Reasonable expectation,'" the court held, "'not advance demonstration, is a basis for merit to be accorded relevant factors.'" *Ibid.* See also *Garrett* v. *FCC,* 168 U. S. App. D. C. 266, 273, 513 F. 2d 1056, 1063 (1975).

In April 1977, the FCC conducted a conference on minority ownership policies, at which participants testified that minority preferences were justified as a means of increasing diversity of broadcast viewpoint. See Task Force Report 4–6. Building on the results of the conference, the recommendations of the task force, the decisions of the Court of Appeals for the District of Columbia Circuit, and a petition proposing

several minority ownership policies filed with the Commission in January 1978 by the Office of Telecommunications Policy (then part of the Executive Office of the President) and the Department of Commerce,[4] the FCC adopted in May 1978 its *Statement of Policy on Minority Ownership of Broadcasting Facilities*, 68 F. C. C. 2d 979. After recounting its past efforts to expand broadcast diversity, the FCC concluded:

> "[W]e are compelled to observe that the views of racial minorities continue to be inadequately represented in the broadcast media. This situation is detrimental not only to the minority audience but to all of the viewing and listening public. Adequate representation of minority viewpoints in programming serves not only the needs and interests of the minority community but also enriches and educates the non-minority audience. It enhances the diversified programming which is a key objective not only of the Communications Act of 1934 but also of the First Amendment." *Id.*, at 980–981 (footnotes omitted).

Describing its actions as only "first steps," *id.*, at 984, the FCC outlined two elements of a minority ownership policy.

First, the Commission pledged to consider minority ownership as one factor in comparative proceedings for new licenses. When the Commission compares mutually exclusive applications for new radio or television broadcast stations,[5] it

---

[4] See Telecommunications Minority Assistance Program, Public Papers of the Presidents, Jimmy Carter, Vol. 1, Jan. 31, 1978, pp. 252, 253 (1979). The petition observed that "[m]inority ownership markedly serves the public interest, for it ensures the sustained and increased sensitivity to minority audiences." *Id.*, at 252. See also n. 45, *infra*.

[5] In *Ashbacker Radio Corp.* v. *FCC*, 326 U. S. 327 (1945), we held that when the Commission was faced with two "mutually exclusive" bona fide applications for license—that is, two proposed stations that would be incompatible technologically—it was obligated to set the applications for a comparative hearing. See *id.*, at 333.

looks principally at six factors: diversification of control of mass media communications, full-time participation in station operation by owners (commonly referred to as the "integration" of ownership and management), proposed program service, past broadcast record, efficient use of the frequency, and the character of the applicants. See *Policy Statement on Comparative Broadcast Hearings*, 1 F. C. C. 2d 393, 394–399 (1965); *West Michigan Broadcasting Co.* v. *FCC*, 236 U. S. App. D. C. 335, 338–339, 735 F. 2d 601, 604–607 (1984), cert. denied, 470 U. S. 1027 (1985). In the Policy Statement on Minority Ownership, the FCC announced that minority ownership and participation in management would be considered in a comparative hearing as a "plus" to be weighed together with all other relevant factors. See *WPIX, Inc.*, 68 F. C. C. 2d 381, 411–412 (1978). The "plus" is awarded only to the extent that a minority owner actively participates in the day-to-day management of the station.

Second, the FCC outlined a plan to increase minority opportunities to receive reassigned and transferred licenses through the so-called "distress sale" policy. See 68 F. C. C. 2d, at 983. As a general rule, a licensee whose qualifications to hold a broadcast license come into question may not assign or transfer that license until the FCC has resolved its doubts in a noncomparative hearing. The distress sale policy is an exception to that practice, allowing a broadcaster whose license has been designated for a revocation hearing, or whose renewal application has been designated for hearing, to assign the license to an FCC-approved minority enterprise. See *ibid.; Commission Policy Regarding the Advancement of Minority Ownership in Broadcasting*, 92 F. C. C. 2d 849, 851 (1982). The assignee must meet the FCC's basic qualifications, and the minority ownership must exceed 50 percent or be controlling.[6] The buyer must purchase the license be-

---

[6] In 1982, the FCC determined that a limited partnership could qualify as a minority enterprise if the general partner is a member of a minority

fore the start of the revocation or renewal hearing, and the price must not exceed 75 percent of fair market value. These two Commission minority ownership policies are at issue today.[7]

B

1

In No. 89–453, petitioner Metro Broadcasting, Inc. (Metro), challenges the Commission's policy awarding preferences to minority owners in comparative licensing proceedings. Several applicants, including Metro and Rainbow Broadcasting (Rainbow), were involved in a comparative proceeding to select among three mutually exclusive proposals to construct and operate a new UHF television station in the Orlando, Florida, metropolitan area. After an evidentiary hearing, an Administrative Law Judge (ALJ) granted Metro's application. *Metro Broadcasting, Inc.*, 96 F. C. C. 2d 1073 (1983). The ALJ disqualified Rainbow from consideration because of "misrepresentations" in its application. *Id.*, at 1087. On review of the ALJ's decision, however, the Commission's Review Board disagreed with the ALJ's finding regarding Rainbow's candor and concluded that Rainbow was qualified. *Metro Broadcasting, Inc.*, 99 F. C. C. 2d 688 (1984). The Board proceeded to consider Rainbow's comparative showing and found it superior to Metro's. In so doing, the Review Board awarded Rainbow a substantial enhance-

---

group who holds at least a 20 percent interest and who will exercise "complete control over a station's affairs." 92 F. C. C. 2d, at 855.

[7] The FCC also announced in its 1978 statement a tax certificate policy and other minority preferences, see 68 F. C. C. 2d, at 983, and n. 19; 92 F. C. C. 2d, at 850–851, which are not at issue today. Similarly, the Commission's gender preference policy, see *Gainesville Media, Inc.*, 70 F. C. C. 2d 143, 149 (Rev. Bd. 1978); *Mid-Florida Television Corp.*, 69 F. C. C. 2d 607, 651–652 (Rev. Bd. 1978), set aside on other grounds, 87 F. C. C. 2d 203 (1981), is not before us today. See *Winter Park Communications, Inc.* v. *FCC*, 277 U. S. App. D. C. 134, 139–140, n. 5, 873 F. 2d 347, 352–353, n. 5 (1989); *Metro Broadcasting, Inc.*, 3 F. C. C. Rcd 866, 867, n. 1 (1988).

ment on the ground that it was 90 percent Hispanic owned, whereas Metro had only one minority partner who owned 19.8 percent of the enterprise. The Review Board found that Rainbow's minority credit outweighed Metro's local residence and civic participation advantage. *Id.*, at 704. The Commission denied review of the Board's decision largely without discussion, stating merely that it "agree[d] with the Board's resolution of this case." No. 85–558 (Oct. 18, 1985), p. 2, App. to Pet. for Cert. in No. 89–453, p. 61a.

Metro sought review of the Commission's order in the United States Court of Appeals for the District of Columbia Circuit, but the appeal's disposition was delayed; at the Commission's request, the court granted a remand of the record for further consideration in light of a separate ongoing inquiry at the Commission regarding the validity of its minority and female ownership policies, including the minority enhancement credit. See *Notice of Inquiry on Racial, Ethnic or Gender Classifications,* 1 F. C. C. Rcd 1315 (1986) (Docket 86–484).[8] The Commission determined that the outcome in the licensing proceeding between Rainbow and Metro might depend on whatever the Commission concluded

---

[8] That inquiry grew out of the Court of Appeals' decision in *Steele* v. *FCC,* 248 U. S. App. D. C. 279, 770 F. 2d 1192 (1985), in which a panel of the Court of Appeals held that the FCC lacks statutory authority to grant enhancement credits in comparative license proceedings to women owners. Although the panel expressly stated that "[u]nder our decisions, the Commission's authority to adopt minority preferences . . . is clear," *id.*, at 283, 770 F. 2d, at 1196, the Commission believed that the court's opinion nevertheless raised questions concerning its minority ownership policies. After the en banc court vacated the panel opinion and set the case for rehearing, the FCC requested that the Court of Appeals remand the case without considering the merits to allow the FCC to reconsider the basis of its preference policy. The request was granted. The Commission, "despite its prior misgivings, has now indicated clearly that it supports the distress sale" and other minority ownership policies, *Shurberg Broadcasting of Hartford, Inc.* v. *FCC,* 278 U. S. App. D. C. 24, 81, 876 F. 2d 902, 959 (1989) (Wald, C. J., dissenting from denial of rehearing en banc), and has defended them before this Court.

in its general evaluation of minority ownership policies, and accordingly it held the licensing proceeding in abeyance pending further developments in the Docket 86–484 review. See *Metro Broadcasting, Inc.*, 2 F. C. C. Rcd 1474, 1475 (1987).

Prior to the Commission's completion of its Docket 86–484 inquiry, however, Congress enacted and the President signed into law the FCC appropriations legislation for fiscal year 1988. The measure prohibited the Commission from spending any appropriated funds to examine or change its minority ownership policies.[9] Complying with this directive, the Commission closed its Docket 86–484 inquiry. See *Reexamination of Racial, Ethnic or Gender Classifications, Order*, 3 F. C. C. Rcd 766 (1988). The FCC also reaffirmed its grant of the license in this case to Rainbow Broadcasting. See *Metro Broadcasting, Inc.*, 3 F. C. C. Rcd 866 (1988).

The case returned to the Court of Appeals, and a divided panel affirmed the Commission's order awarding the license to Rainbow. The court concluded that its decision was controlled by prior Circuit precedent and noted that the Commission's action was supported by "'highly relevant congressional action that showed clear recognition of the extreme underrepresentation of minorities and their perspectives in

---

[9] The appropriations legislation provided:

"That none of the funds appropriated by this Act shall be used to repeal, to retroactively apply changes in, or to continue a reexamination of, the policies of the Federal Communications Commission with respect to comparative licensing, distress sales and tax certificates granted under 26 U. S. C. § 1071, to expand minority and women ownership of broadcasting licenses, including those established in Statement of Policy on Minority Ownership of Broadcast Facilities, 68 F. C. C. 2d 979 and 69 F. C. C. 2d 1591, as amended, 52 R. R. 2d [1301] (1982) and Mid-Florida Television Corp., [69] F. C. C. 2d 607 Rev. Bd. (1978) which were effective prior to September 12, 1986, other than to close MM Docket No. 86–484 with a reinstatement of prior policy and a lifting of suspension of any sales, licenses, applications, or proceedings, which were suspended pending the conclusion of the inquiry." Continuing Appropriations Act for Fiscal Year 1988, Pub. L. 100–202, 101 Stat. 1329–31.

the broadcast mass media.'" *Winter Park Communications, Inc.* v. *FCC*, 277 U. S. App. D. C. 134, 140, 873 F. 2d 347, 353 (1989), quoting *West Michigan*, 236 U. S. App. D. C., at 347, 735 F. 2d, at 613. After petitions for rehearing and suggestions for rehearing en banc were denied, we granted certiorari. 493 U. S. 1017 (1990).

### 2

The dispute in No. 89–700 emerged from a series of attempts by Faith Center, Inc., the licensee of a Hartford, Connecticut, television station, to execute a minority distress sale. In December 1980, the FCC designated for a hearing Faith Center's application for renewal of its license. See *Faith Center, Inc.*, FCC 80–680 (Dec. 21, 1980). In February 1981, Faith Center filed with the FCC a petition for special relief seeking permission to transfer its license under the distress sale policy. The Commission granted the request, see *Faith Center, Inc.*, 88 F. C. C. 2d 788 (1981), but the proposed sale was not completed, apparently due to the purchaser's inability to obtain adequate financing. In September 1983, the Commission granted a second request by Faith Center to pursue a distress sale to another minority-controlled buyer. The FCC rejected objections to the distress sale raised by Alan Shurberg, who at that time was acting in his individual capacity.[10] See *Faith Center, Inc.*, 54 Radio Reg. 2d (P&F) 1286, 1287–1288 (1983); *Faith Center, Inc.*, 55 Radio Reg. 2d (P&F) 41, 44–46 (Mass Media Bur. 1984). This second distress sale also was not consummated, apparently because of similar financial difficulties on the buyer's part.

In December 1983, respondent Shurberg Broadcasting of Hartford, Inc. (Shurberg), applied to the Commission for a permit to build a television station in Hartford. The application was mutually exclusive with Faith Center's renewal

---

[10] Mr. Shurberg is the sole owner of Shurberg Broadcasting of Hartford, Inc., respondent in No. 89–700.

application, then still pending. In June 1984, Faith Center again sought the FCC's approval for a distress sale, requesting permission to sell the station to Astroline Communications Company Limited Partnership (Astroline), a minority applicant. Shurberg opposed the sale to Astroline on a number of grounds, including that the FCC's distress sale program violated Shurberg's right to equal protection. Shurberg therefore urged the Commission to deny the distress sale request and to schedule a comparative hearing to examine the application Shurberg had tendered alongside Faith Center's renewal request. In December 1984, the FCC approved Faith Center's petition for permission to assign its broadcast license to Astroline pursuant to the distress sale policy. See *Faith Center, Inc.*, 99 F. C. C. 2d 1164 (1984). The FCC rejected Shurberg's equal protection challenge to the policy as "without merit." *Id.*, at 1171.

Shurberg appealed the Commission's order to the United States Court of Appeals for the District of Columbia Circuit, but disposition of the appeal was delayed pending completion of the Commission's Docket 86–484 inquiry into the minority ownership policies. See *supra*, at 559. After Congress enacted and the President signed into law the appropriations legislation prohibiting the FCC from continuing the Docket 86–484 proceeding, see *supra*, at 560, the Commission reaffirmed its order granting Faith Center's request to assign its Hartford license to Astroline pursuant to the minority distress sale policy. See *Faith Center, Inc.*, 3 F. C. C. Rcd 868 (1988).

A divided Court of Appeals invalidated the Commission's minority distress sale policy. *Shurberg Broadcasting of Hartford, Inc.* v. *FCC*, 278 U. S. App. D. C. 24, 876 F. 2d 902 (1989). In a *per curiam* opinion, the panel majority held that the policy "unconstitutionally deprives Alan Shurberg and Shurberg Broadcasting of their equal protection rights under the Fifth Amendment because the program is not narrowly tailored to remedy past discrimination or to promote

programming diversity" and that "the program unduly burdens Shurberg, an innocent nonminority, and is not reasonably related to the interests it seeks to vindicate." *Id.*, at 24–25, 876 F. 2d, at 902–903. Petitions for rehearing and suggestions for rehearing en banc were denied, and we granted certiorari. 493 U. S. 1018 (1990).

## II

It is of overriding significance in these cases that the FCC's minority ownership programs have been specifically approved—indeed, mandated—by Congress. In *Fullilove* v. *Klutznick*, 448 U. S. 448 (1980), Chief Justice Burger, writing for himself and two other Justices, observed that although "[a] program that employs racial or ethnic criteria . . . calls for close examination," when a program employing a benign racial classification is adopted by an administrative agency at the explicit direction of Congress, we are "bound to approach our task with appropriate deference to the Congress, a co-equal branch charged by the Constitution with the power to 'provide for the . . . general Welfare of the United States' and 'to enforce, by appropriate legislation,' the equal protection guarantees of the Fourteenth Amendment." *Id.*, at 472; see also *id.*, at 491; *id.*, at 510, and 515–516, n. 14 (Powell, J., concurring); *id.*, at 517–520 (MARSHALL, J., concurring in judgment). We explained that deference was appropriate in light of Congress' institutional competence as the National Legislature, see *id.*, at 490 (opinion of Burger, C. J.); *id.*, at 498 (Powell, J., concurring), as well as Congress' powers under the Commerce Clause, see *id.*, at 475–476 (opinion of Burger, C. J.); *id.*, at 499 (Powell, J., concurring), the Spending Clause, see *id.*, at 473–475, 478 (opinion of Burger, C. J.), and the Civil War Amendments, see *id.*, at 476–478 (opinion of Burger, C. J.); *id.*, at 500, 508–509 (Powell, J., concurring).[11]

---

[11] JUSTICE O'CONNOR's suggestion that the deference to Congress described in *Fullilove* rested entirely on Congress' powers under § 5 of the

A majority of the Court in *Fullilove* did not apply strict scrutiny to the race-based classification at issue. Three Members inquired "whether the *objectives* of th[e] legislation are within the power of Congress" and "whether the limited use of racial and ethnic criteria . . . is a constitutionally permissible *means* for achieving the congressional objectives." *Id.*, at 473 (opinion of Burger, C. J.) (emphasis in original). Three other Members would have upheld benign racial classifications that "serve important governmental objectives and are substantially related to achievement of those objectives." *Id.*, at 519 (MARSHALL, J., concurring in judgment). We apply that standard today. We hold that benign race-conscious measures mandated by Congress[12]—even if those

---

Fourteenth Amendment, *post*, at 606–607, is simply incorrect. The Chief Justice expressly noted that in enacting the provision at issue, "Congress employed an amalgam of its specifically delegated powers." 448 U. S., at 473.

[12] We fail to understand how JUSTICE KENNEDY can pretend that examples of "benign" race-conscious measures include South African apartheid, the "separate-but-equal" law at issue in *Plessy* v. *Ferguson*, 163 U. S. 537 (1896), and the internment of American citizens of Japanese ancestry upheld in *Korematsu* v. *United States*, 323 U. S. 214 (1944). We are confident that an "examination of the legislative scheme and its history," *Weinberger* v. *Wiesenfeld*, 420 U. S. 636, 648, n. 16 (1975), will separate benign measures from other types of racial classifications. See, *e. g.*, *Mississippi Univ. for Women* v. *Hogan*, 458 U. S. 718, 728–730 (1982). Of course, "the mere recitation of a benign, compensatory purpose is not an automatic shield which protects against any inquiry into the actual purposes underlying a statutory scheme." *Weinberger, supra*, at 648; see also Brest, Foreword: In Defense of the Antidiscrimination Principle, 90 Harv. L. Rev. 1, 21–22 (1976); Strauss, The Myth of Colorblindness, 1986 Sup. Ct. Rev. 99, 128–129. The concept of benign race-conscious measures—even those with at least some nonremedial purposes—is as old as the Fourteenth Amendment. For example, the Freedman's Bureau Acts authorized the provision of land, education, medical care, and other assistance to Afro-Americans. See, *e. g.*, Cong. Globe, 39th Cong., 1st Sess., 630 (1866) (statement of Rep. Hubbard) ("I think that the nation will be a great gainer by encouraging the policy of the Freedman's Bureau, in the cultivation of its wild lands, in the increased wealth which industry brings and in the res-

measures are not "remedial" in the sense of being designed to compensate victims of past governmental or societal discrimination—are constitutionally permissible to the extent that they serve important governmental objectives within the power of Congress and are substantially related to achievement of those objectives.

Our decision last Term in *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469 (1989), concerning a minority set-aside program adopted by a municipality, does not prescribe the level of scrutiny to be applied to a benign racial classification employed by Congress. As JUSTICE KENNEDY noted, the question of congressional action was not before the Court, *id.*, at 518 (opinion concurring in part and concurring in judgment), and so *Croson* cannot be read to undermine our decision in *Fullilove*. In fact, much of the language and reasoning in *Croson* reaffirmed the lesson of *Fullilove* that race-conscious classifications adopted by Congress to address racial and ethnic discrimination are subject to a different standard than such classifications prescribed by state and local governments. For example, JUSTICE O'CONNOR, joined by two other Members of this Court, noted that "Congress may identify and redress the effects of society-wide discrimination," 488 U. S., at 490, and that Congress "need not make specific findings of discrimination to engage in race-conscious relief." *Id.*, at 489.[13] Echoing *Fullilove*'s emphasis on Con-

---

toration of law and order in the insurgent States"). See generally Sandalow, Racial Preferences in Higher Education: Political Responsibility and the Judicial Role, 42 U. Chi. L. Rev. 653, 664–666 (1975); Schnapper, Affirmative Action and the Legislative History of the Fourteenth Amendment, 71 Va. L. Rev. 753, 754–783 (1985).

[13] JUSTICE O'CONNOR, in a passage joined by THE CHIEF JUSTICE and JUSTICE WHITE, observed that the decision in *Fullilove* had been influenced by the fact that the set-aside program at issue was " '*congressionally* mandated.'" 488 U. S., at 491 (citation omitted; emphasis in original). JUSTICE O'CONNOR's opinion acknowledged that our decision in *Fullilove* regarding a congressionally approved preference "did not employ 'strict scrutiny.'" 488 U. S., at 487.

gress as a National Legislature that stands above factional politics, JUSTICE SCALIA argued that as a matter of "social reality and governmental theory," the Federal Government is unlikely to be captured by minority racial or ethnic groups and used as an instrument of discrimination. 488 U. S., at 522 (opinion concurring in judgment). JUSTICE SCALIA explained that "[t]he struggle for racial justice has historically been a struggle by the national society against oppression in the individual States," because of the "heightened danger of oppression from political factions in small, rather than large, political units." *Id.*, at 522, 523.[14]

We hold that the FCC minority ownership policies pass muster under the test we announce today. First, we find that they serve the important governmental objective of broadcast diversity. Second, we conclude that they are substantially related to the achievement of that objective.

## A

Congress found that "the effects of past inequities stemming from racial and ethnic discrimination have resulted in a severe underrepresentation of minorities in the media of mass communications." H. R. Conf. Rep. No. 97–765, p. 43 (1982). Congress and the Commission do not justify the minority ownership policies strictly as remedies for victims of this discrimination, however. Rather, Congress and the FCC have selected the minority ownership policies primarily to promote programming diversity, and they urge that such diversity is an important governmental objective that can serve as a constitutional basis for the preference policies. We agree.

We have long recognized that "[b]ecause of the scarcity of [electromagnetic] frequencies, the Government is permitted to put restraints on licensees in favor of others whose views

---

[14] See also *id.*, at 495–496 (opinion of O'CONNOR, J.); Ely, The Constitutionality of Reverse Racial Discrimination, 41 U. Chi. L. Rev. 723, 728–735 (1974), cited with approval in *Croson*, 488 U. S., at 496.

should be expressed on this unique medium." *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 390 (1969). The Government's role in distributing the limited number of broadcast licenses is not merely that of a "traffic officer," *National Broadcasting Co.* v. *United States*, 319 U. S. 190, 215 (1943); rather, it is axiomatic that broadcasting may be regulated in light of the rights of the viewing and listening audience and that "the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public." *Associated Press* v. *United States*, 326 U. S. 1, 20 (1945). Safeguarding the public's right to receive a diversity of views and information over the airwaves is therefore an integral component of the FCC's mission. We have observed that "'the "public interest" standard necessarily invites reference to First Amendment principles,'" *FCC* v. *National Citizens Committee for Broadcasting*, 436 U. S. 775, 795 (1978), quoting *Columbia Broadcasting System, Inc.* v. *Democratic National Committee*, 412 U. S. 94, 122 (1973), and that the Communications Act of 1934 has designated broadcasters as "fiduciaries for the public." *FCC* v. *League of Women Voters of Cal.*, 468 U. S. 364, 377 (1984). "[T]he people as a whole retain their interest in free speech by radio [and other forms of broadcast] and their collective right to have the medium function consistently with the ends and purposes of the First Amendment," and "[i]t is the right of the viewers and listeners, not the right of the broadcasters, which is paramount." *Red Lion, supra*, at 390. "Congress may . . . seek to assure that the public receives through this medium a balanced presentation of information on issues of public importance that otherwise might not be addressed if control of the medium were left entirely in the hands of those who own and operate broadcasting stations." *League of Women Voters, supra*, at 377.

Against this background, we conclude that the interest in enhancing broadcast diversity is, at the very least, an important governmental objective and is therefore a sufficient

basis for the Commission's minority ownership policies. Just as a "diverse student body" contributing to a "'robust exchange of ideas'" is a "constitutionally permissible goal" on which a race-conscious university admissions program may be predicated, *Regents of University of California* v. *Bakke,* 438 U. S. 265, 311–313 (1978) (opinion of Powell, J.), the diversity of views and information on the airwaves serves important First Amendment values. Cf. *Wygant* v. *Jackson Board of Education,* 476 U. S. 267, 314–315 (1986) (STEVENS, J., dissenting).[15] The benefits of such diversity are not limited to the members of minority groups who gain access to the broadcasting industry by virtue of the ownership policies; rather, the benefits redound to all members of the viewing and listening audience. As Congress found, "the American public will benefit by having access to a wider diversity of information sources." H. R. Conf. Rep. No. 97–765, *supra,* at 45; see also Minority Ownership of Broadcast Stations: Hearing before the Subcommittee on Communications of the Senate Committee on Commerce, Science, and Transportation, 101st Cong., 1st Sess., 66 (1989) (testimony of Roderick Porter, Deputy Chief, Mass Media Bureau of the FCC) ("[T]he FCC's minority policies are based on our conclusion that the entire broadcast audience, regardless of its racial composition, will benefit").

---

[15] In *Wygant* v. *Jackson Board of Education,* JUSTICE O'CONNOR noted that, "although its precise contours are uncertain, a state interest in the promotion of racial diversity has been found sufficiently 'compelling,' at least in the context of higher education, to support the use of racial considerations in furthering that interest." 476 U. S., at 286 (opinion concurring in part and concurring in judgment). She further stated that "nothing the Court has said today necessarily forecloses the possibility that the Court will find other governmental interests which have been relied upon in the lower courts but which have not been passed on here to be sufficiently 'important' or 'compelling' to sustain the use of affirmative action policies." *Ibid.* Cf. *post,* at 612 (O'CONNOR, J., dissenting).

B

We also find that the minority ownership policies are substantially related to the achievement of the Government's interest. One component of this inquiry concerns the relationship between expanded minority ownership and greater broadcast diversity; both the FCC and Congress have determined that such a relationship exists. Although we do not "'defer' to the judgment of the Congress and the Commission on a constitutional question," and would not "hesitate to invoke the Constitution should we determine that the Commission has not fulfilled its task with appropriate sensitivity" to equal protection principles, *Columbia Broadcasting System, Inc.* v. *Democratic National Committee*, 412 U. S., at 103, we must pay close attention to the expertise of the Commission and the factfinding of Congress when analyzing the nexus between minority ownership and programming diversity. With respect to this "complex" empirical question, *ibid.*, we are required to give "great weight to the decisions of Congress and the experience of the Commission." *Id.*, at 102.

1

The FCC has determined that increased minority participation in broadcasting promotes programming diversity. As the Commission observed in its 1978 *Statement of Policy on Minority Ownership of Broadcasting Facilities*, "ownership of broadcast facilities by minorities is [a] significant way of fostering the inclusion of minority views in the area of programming," and "[f]ull minority participation in the ownership and management of broadcast facilities results in a more diverse selection of programming." 68 F. C. C. 2d, at 981. Four years later, the FCC explained that it had taken "steps to enhance the ownership and participation of minorities in the media" in order to "increas[e] the diversity in the control of the media and thus diversity in the selection of available programming, benefitting the public and serving the principle of the First Amendment." *Minority Ownership in Broadcast-*

*ing*, 92 F. C. C. 2d, at 849–850. See also *Radio Jonesboro, Inc.*, 100 F. C. C. 2d 941, 945, n. 9 (1985) ("'[T]here is a critical underrepresentation of minorities in broadcast ownership, and full minority participation in the ownership and management of broadcast facilities is essential to realize the fundamental goals of programming diversity and diversification of ownership'") (citation omitted). The FCC's conclusion that there is an empirical nexus between minority ownership and broadcasting diversity is a product of its expertise, and we accord its judgment deference.

Furthermore, the FCC's reasoning with respect to the minority ownership policies is consistent with longstanding practice under the Communications Act. From its inception, public regulation of broadcasting has been premised on the assumption that diversification of ownership will broaden the range of programming available to the broadcast audience.[16] Thus, "it is upon *ownership* that public policy places

---

[16] For example, in 1953, the Commission promulgated the first of its multiple ownership rules, the "fundamental purpose" of which is "to promote diversification of ownership in order to maximize diversification of program and service viewpoints." *Amendment of Sections 3.35, 3.240, and 3.636 of Rules and Regulations Relating to Multiple Ownership of AM, FM, and Television Broadcast Stations, Report and Order*, 18 F. C. C. 288, 291. Initially, the multiple ownership rules limited only the common control of broadcast stations. The Commission's current rules include limitations on broadcast/newspaper cross-ownership, cable/television cross-ownership, broadcast service cross-ownership, and common control of broadcast stations. See 47 CFR §§ 73.3555, 76.501 (1989). The Commission has always focused on ownership, on the theory that "ownership carries with it the power to select, to edit, and to choose the methods, manner and emphasis of presentation, all of which are a critical aspect of the Commission's concern with the public interest." *Amendment of Sections 73.34, 73.240, and 73.636 of Commission's Rules Relating to Multiple Ownership of Standard, FM, and Television Broadcast Stations, Second Report and Order*, 50 F. C. C. 2d 1046, 1050 (1975); see also *Amendment of Sections 73.35, 73.240, and 73.636 of Commission Rules Relating to Multiple Ownership of Standard, FM, and Television Broadcast Stations, First Report and Order*, 22 F. C. C. 2d 306, 307 (1970) (multiple ownership rules "promot[e] diversification of programming sources and viewpoints"); *Amend-*

primary reliance with respect to diversification of content, and that historically has proved to be significantly influential with respect to editorial comment and the presentation of news." *TV 9, Inc.*, 161 U. S. App. D. C., at 358, 495 F. 2d, at 938 (emphasis added). The Commission has never relied on the market alone to ensure that the needs of the audience are met. Indeed, one of the FCC's elementary regulatory assumptions is that broadcast content is not purely market driven; if it were, there would be little need for consideration in licensing decisions of such factors as integration of ownership and management, local residence, and civic participation. In this vein, the FCC has compared minority preferences to local residence and other integration credits:

> "[B]oth local residence and minority ownership are fundamental considerations in our licensing scheme. Both policies complement our concern with diversification of control of broadcast ownership. Moreover, similar assumptions underlie both policies. We award enhancement credit for local residence because . . . [i]t is expected that [an] increased knowledge of the community of license will be reflected in a station's programming. Likewise, credit for minority ownership and participation is awarded in a comparative proceeding [because] 'minority ownership is likely to increase diversity of content, especially of opinion and viewpoint.'" *Radio Jonesboro, Inc., supra*, at 945 (footnotes omitted).

---

ment of Sections *73.35, 73.240, and 73.636 of Commission's Rules Relating to Multiple Ownership of Standard, FM, and Television Broadcast Stations, Report and Order*, 45 F. C. C. 1476, 1477, 1482 (1964) ("[T]he greater the diversity of ownership in a particular area, the less chance there is that a single person or group can have 'an inordinate effect in a . . . programming sense, on public opinion at the regional level'"); *Editorializing by Broadcast Licensees*, 13 F. C. C. 1246, 1252 (1949) (ownership enables licensee "to insure that his personal viewpoint on any particular issue is presented in his station's broadcasts").

## 2

Congress also has made clear its view that the minority ownership policies advance the goal of diverse programming. In recent years, Congress has specifically required the Commission, through appropriations legislation, to maintain the minority ownership policies without alteration.    See n. 9, *supra.*   We would be remiss, however, if we ignored the long history of congressional support for those policies prior to the passage of the appropriations Acts because, for the past two decades, Congress has consistently recognized the barriers encountered by minorities in entering the broadcast industry and has expressed emphatic support for the Commission's attempts to promote programming diversity by increasing minority ownership.   Limiting our analysis to the immediate legislative history of the appropriations Acts in question "would erect an artificial barrier to [a] full understanding of the legislative process."   *Fullilove* v. *Klutznick,* 448 U. S., at 502 (Powell, J., concurring).   The "special attribute [of Congress] as a legislative body lies in its broader mission to investigate and consider all facts and opinions that may be relevant to the resolution of an issue.   One appropriate source is the information and expertise that Congress acquires in the consideration and enactment of earlier legislation.   After Congress has legislated repeatedly in an area of national concern, its Members gain experience that may reduce the need for fresh hearings or prolonged debate when Congress again considers action in that area."   *Id.,* at 502–503; see also *id.,* at 478 (opinion of Burger, C. J.) ("Congress, of course, may legislate without compiling the kind of 'record' appropriate with respect to judicial or administrative proceedings").

Congress' experience began in 1969, when it considered a bill that would have eliminated the comparative hearing in license renewal proceedings, in order to avoid "the filing of a

multiplicity of competing applications, often from groups un-known" and to restore order and predictability to the renewal process to "give the current license holder the benefit of the doubt warranted by his previous investment and experi-ence." 115 Cong. Rec. 14813 (1969) (letter of Sen. Scott). Congress heard testimony that, because the most valuable broadcast licenses were assigned many years ago, compara-tive hearings at the renewal stage afford an important oppor-tunity for excluded groups, particularly minorities, to gain entry into the industry.[17] Opponents warned that the bill would "exclude minority groups from station ownership in important markets" by "fr[eezing]" the distribution of exist-ing licenses.[18] Congress rejected the bill.

Congress confronted the issue again in 1973 and 1974, when congressional subcommittees held extensive hearings on proposals to extend the broadcast license period from three to five years and to modify the comparative hearing process for license renewals. Witnesses reiterated that re-newals provided a valuable opportunity for minorities to ob-tain a foothold in the industry.[19] The proposals were never enacted, and the renewal process was left intact.

---

[17] See Amend the Communications Act of 1934: Hearings on S. 2004 be-fore the Subcommittee on Communications of the Senate Committee on Commerce, 91st Cong., 1st Sess., pt. 1, p. 128 (1969) (testimony of Earle Moore, National Citizens Committee for Broadcasting); *id.*, pt. 2, at 520–521 (testimony of John Pamberton, American Civil Liberties Union); *id.*, at 566–567 (testimony of David Batzka, United Christian Missionary Society); *id.*, at 626–627 (testimony of William Hudgins, Freedom National Bank).

[18] *Id.*, at 642 (testimony of John McLaughlin, then associate editor of America magazine).

[19] See Broadcast License Renewal: Hearings on H. R. 5546 et al. before the Subcommittee on Communications and Power of the House Committee on Interstate and Foreign Commerce, 93d Cong., 1st Sess., pt. 1, pp. 495–497 (1973) (testimony of William E. Hanks, Pittsburgh Community Coalition for Media Change); *id.*, at 552–559 (testimony of Rev. George Brewer, Greater Dallas-Fort Worth Coalition for the Free Flow of In-formation); *id.*, at 572–594 (testimony of James McCuller, Action for a Better Community, Inc.); *id.*, pt. 2, at 686–689 (testimony of Morton Ham-

During 1978, both the FCC and the Office of Telecommunications Policy presented their views to Congress as it considered a bill to deregulate the broadcast industry. The proposed Communications Act of 1978 would have, among other things, replaced comparative hearings with a lottery and created a fund for minorities who sought to purchase stations. As described by Representative Markey, the measure was intended to increase "the opportunities for blacks and women and other minorities in this country to get into the communications systems in this country so that their point of view and their interests can be represented." The Communications Act of 1978: Hearings on H. R. 13015 before the Subcommittee on Communications of the House Committee on Interstate and Foreign Commerce, 95th Cong., 2d Sess., vol. 5, pt. 1, p. 59 (1978). The bill's sponsor, Representative Van Deerlin, stated: "It was the hope, and with some reason the expectation of the framers of the bill, that the most effective way to reach the inadequacies of the broadcast industry in employment and programming would be by doing something at the top, that is, increasing minority ownership and management and control in broadcast stations." *Id.*, vol. 3, at 698.

The Executive Branch objected to the lottery proposal on the ground that it would harm minorities by eliminating the credit granted under the comparative hearing scheme as developed by the FCC. See *id.*, at 50. Although it acknowledged that a lottery could be structured to alleviate that concern by attributing a weight to minority ownership, see *id.*, at 85, the Executive Branch explained that it preferred to

burg, adjunct assistant professor of communications law, New York University); Broadcast License Renewal Act: Hearings on S. 16 et al. before the Subcommittee on Communications of the Senate Committee on Commerce, 93d Cong., 2d Sess., pt. 1, pp. 325–329 (1974) (testimony of Ronald H. Brown, National Urban League); *id.*, at 376–381 (testimony of Gladys T. Lindsay, Citizens Committee on Media); *id.*, at 408–411 (testimony of Joseph L. Rauh, Jr., Leadership Conference on Civil Rights and Americans for Democratic Action); *id.*, pt. 2, at 785–800 (testimony of Manuel Fierro, Raza Association of Spanish Surnamed Americans).

grant credit for minority ownership during comparative hearings as a more finely tuned way of achieving the Communication Act's goal of broadcast diversity. See *ibid.* (contending that a lottery would not take into account the individual needs of particular communities).

Although no lottery legislation was enacted that year, Congress continued to explore the idea,[20] and when in 1981 it ultimately authorized a lottery procedure, Congress established a concomitant system of minority preferences. See Omnibus Budget Reconciliation Act of 1981, Pub. L. 97–35, 95 Stat. 357, 736–737. The Act provided that where more than one application for an initial license or construction permit was received, the Commission could grant the license or permit to a qualified applicant "through the use of a system of random selection," 47 U. S. C. § 309(i)(1) (1982 ed.), so long as the FCC adopted rules to ensure "significant preferences" in the lottery process to groups underrepresented in the ownership of telecommunications facilities. § 309(i)(3)(A). The accompanying Conference Report announced Congress' "firm intention" to award a lottery preference to minorities and other historically underrepresented groups, so that "the objective of increasing the number of media outlets owned by such persons or groups [would] be met." H. R. Conf. Rep. No. 97–208, p. 897 (1981). After the FCC complained of the difficulty of defining "underrepresented" groups and raised other problems concerning the statute,[21] Congress enacted a second lottery statute reaffirming its intention in unmistakable terms. Section 115 of the Communications Amend-

---

[20] For example, the proposed Communications Act of 1979 would have provided that any minority applicant for a previously unassigned license would be counted twice in the lottery pool. See Staff of the Subcommittee on Communications of the House Committee on Interstate and Foreign Commerce, H. R. 3333, "The Communications Act of 1979" Section-by-Section Analysis, 96th Cong., 1st Sess., 39–41 (Comm. Print 1979).

[21] See *Amendment of Part 1 of Commission's Rules to Allow Selection from Among Mutually Exclusive Competing Applications Using Random Selection or Lotteries Instead of Comparative Hearings,* 89 F. C. C. 2d 257, 277–284 (1982).

ments Act of 1982, Pub. L. 97–259, 96 Stat. 1094 (amending 47 U. S. C. § 309(i) (1982 ed.)), directs that in any random selection lottery conducted by the FCC, a preference is to be granted to every applicant whose receipt of a license would increase the diversification of mass media ownership and that, "[t]o further diversify the ownership of the media of mass communications, an additional significant preference [is to be given] to any applicant controlled by a member or members of a minority group." § 309(i)(3)(A). Observing that the nexus between ownership and programming "has been repeatedly recognized by both the Commission and the courts," Congress explained that it sought "to promote the diversification of media ownership and consequent diversification of programming content," a principle that "is grounded in the First Amendment." H. R. Conf. Rep. No. 97–765, p. 40 (1982). With this new mandate from Congress, the Commission adopted rules to govern the use of a lottery system to award licenses for low power television stations.[22]

The minority ownership issue returned to the Congress in October 1986,[23] when a House subcommittee held a hearing to examine the Commission's inquiry into the validity of its minority ownership policies. The subcommittee chair expressed his view that "[t]he most important message of this

---

[22] See *Amendment of the Commission's Rules to Allow the Selection from Among Certain Competing Applications Using Random Selection or Lotteries Instead of Comparative Hearings*, 93 F. C. C. 2d 952 (1983).

[23] The issue had surfaced briefly in the 98th Congress, where proposals to codify and expand the FCC's minority ownership policies were the subject of extensive hearings in the House. See Minority Participation in the Media: Hearings before the Subcommittee on Telecommunications, Consumer Protection, and Finance of the House Committee on Energy and Commerce, 98th Cong., 1st Sess. (1983); Parity for Minorities in the Media: Hearing on H. R. 1155 before the Subcommittee on Telecommunications, Consumer Protection, and Finance of the House Committee on Energy and Commerce, 98th Cong., 1st Sess. (1983); Broadcast Regulation and Station Ownership: Hearings on H. R. 6122 and H. R. 6134 before the Subcommittee on Telecommunications, Consumer Protection, and Finance of the House Committee on Energy and Commerce, 98th Cong., 2nd Sess. (1984). No legislation was passed.

hearing today, is that the Commission must not dismantle these longstanding diversity policies, which Congress has repeatedly endorsed, until such time as Congress or the courts direct otherwise." Minority-Owned Broadcast Stations: Hearing on H. R. 5373 before the Subcommittee on Telecommunications, Consumer Protection, and Finance of the House Committee on Energy and Commerce, 99th Cong., 2d Sess., 13 (1986) (Rep. Wirth). After the Commission issued an order holding in abeyance, pending completion of the inquiry, actions on licenses and distress sales in which a minority preference would be dispositive,[24] a number of bills proposing codification of the minority ownership policies were introduced in Congress.[25] Members of Congress questioned representatives of the FCC during hearings over a span of six months in 1987 with respect to the FCC appropriation for fiscal year 1988,[26] legislation to reauthorize the Commission for fiscal years 1988 and 1989,[27] and legislation to codify the Commission's minority ownership policies.[28]

---

[24] See *Notice of Inquiry on Racial, Ethnic or Gender Classifications*, 1 F. C. C. Rcd 1315, 1319 (1986), as amended, 2 F. C. C. Rcd 2377 (1987).

[25] These bills recognized the link between minority ownership and diversity. In introducing S. 1095, for example, Senator Lautenberg explained that "[d]iversity of ownership does promote diversity of views. Minority . . . broadcasters serve a need that is not as well served as others. They address issues that others do not." 133 Cong. Rec. 9745 (1987); see also *id.*, at 860 (H. R. 293); *id.*, at 3300 (H. R. 1090); *id.*, at 13742–13745 (S. 1277).

[26] See Commerce, Justice, State, the Judiciary, and Related Agencies Appropriations for Fiscal Year 1988: Hearings on H. R. 2763 before a Subcommittee of the Senate Committee on Appropriations, 100th Cong., 1st Sess. (1987).

[27] See FCC Authorization: Hearing before the Subcommittee on Communications of the Senate Committee on Commerce, Science, and Transportation, 100th Cong., 1st Sess., 55 (1987); FCC and NTIA Authorizations: Hearings on H. R. 2472 before the Subcommittee on Telecommunications and Finance of the House Committee on Energy and Commerce, 100th Cong., 1st Sess., 130–131, 211–212 (1987).

[28] See Broadcasting Improvements Act of 1987: Hearings on S. 1277 before the Subcommittee on Communications of the Senate Committee on Commerce, Science, and Transportation, 100th Cong., 1st Sess., 51 (1987).

Ultimately, Congress chose to employ its appropriations power to keep the FCC's minority ownership policies in place for fiscal year 1988.[29]  See *supra*, at 560.  The Report of the originating Committee on Appropriations explained: "The Congress has expressed its support for such policies in the past and has found that promoting diversity of ownership of broadcast properties satisfies important public policy goals. Diversity of ownership results in diversity of programming and improved service to minority and women audiences."  S. Rep. No. 100–182, p. 76 (1987).  The Committee recognized the continuity of congressional action in the field of minority ownership policies, noting that "[i]n approving a lottery system for the selection of certain broadcast licensees, Congress explicitly approved the use of preferences to promote minority and women ownership."  *Id.*, at 76–77.

Congress has twice extended the prohibition on the use of appropriated funds to modify or repeal minority ownership policies[30] and has continued to focus upon the issue.  For example, in the debate on the fiscal year 1989 legislation, Senator Hollings, chair of both the authorizing committee and the appropriations subcommittee for the FCC, presented to the Senate a summary of a June 1988 report prepared by the Congressional Research Service (CRS), entitled Minority

---

[29] Congress did not simply direct a "kind of mental standstill," *Winter Park*, 277 U. S. App. D. C., at 151, 873 F. 2d, at 364 (Williams, J., concurring in part dissenting in part), but rather in the appropriations legislation expressed its unqualified support for the minority ownership policies and instructed the Commission in no uncertain terms that in Congress' view there was no need to study the topic further.  Appropriations Acts, like any other laws, are binding because they are "passe[d] [by] both Houses and . . . signed by the President."  *United States* v. *Munoz-Flores*, 495 U. S. 385, 396 (1990); *id.*, at 401 (STEVENS, J., concurring in judgment). See also *United States* v. *Will*, 449 U. S. 200, 222 (1980); *United States* v. *Dickerson*, 310 U. S. 554, 555 (1940).

[30] See Departments of Commerce, Justice, and State, the Judiciary and Related Agencies Appropriations Act, 1989, Pub. L. 100–459, 102 Stat. 2216; Departments of Commerce, Justice, and State, the Judiciary and Related Agencies Appropriations Act, 1990, Pub. L. 101–162, 103 Stat. 1020.

Broadcast Station Ownership and Broadcast Programming: Is There a Nexus? The study, Senator Hollings reported, "clearly demonstrates that minority ownership of broadcast stations does increase the diversity of viewpoints presented over the airwaves." 134 Cong. Rec. 18982 (1988).

As revealed by the historical evolution of current federal policy, both Congress and the Commission have concluded that the minority ownership programs are critical means of promoting broadcast diversity. We must give great weight to their joint determination.

## C

The judgment that there is a link between expanded minority ownership and broadcast diversity does not rest on impermissible stereotyping. Congressional policy does not assume that in every case minority ownership and management will lead to more minority-oriented programming or to the expression of a discrete "minority viewpoint" on the airwaves. Neither does it pretend that all programming that appeals to minority audiences can be labeled "minority programming" or that programming that might be described as "minority" does not appeal to nonminorities. Rather, both Congress and the FCC maintain simply that expanded minority ownership of broadcast outlets will, in the aggregate, result in greater broadcast diversity. A broadcasting industry with representative minority participation will produce more variation and diversity than will one whose ownership is drawn from a single racially and ethnically homogeneous group. The predictive judgment about the overall result of minority entry into broadcasting is not a rigid assumption about how minority owners will behave in every case but rather is akin to Justice Powell's conclusion in *Bakke* that greater admission of minorities would contribute, on average, "to the 'robust exchange of ideas.'" 438 U. S., at 313. To be sure, there is no ironclad guarantee that each minority owner will contribute to diversity. But neither was there an

assurance in *Bakke* that minority students would interact with nonminority students or that the particular minority students admitted would have typical or distinct "minority" viewpoints. See *id.*, at 312 (opinion of Powell, J.) (noting only that educational excellence is *"widely believed* to be promoted by a diverse student body") (emphasis added); *id.*, at 313, n. 48 ("'In the nature of things, it is hard to know how, and when, and even if, this informal "learning through diversity" actually occurs'") (citation omitted).

Although all station owners are guided to some extent by market demand in their programming decisions, Congress and the Commission have determined that there may be important differences between the broadcasting practices of minority owners and those of their nonminority counterparts. This judgment—and the conclusion that there is a nexus between minority ownership and broadcasting diversity—is corroborated by a host of empirical evidence.[31]     Evidence

---

[31] For example, the CRS analyzed data from some 8,720 FCC-licensed radio and television stations and found a strong correlation between minority ownership and diversity of programming.   See CRS, Minority Broadcast Station Ownership and Broadcast Programming: Is There a Nexus? (June 29, 1988).   While only 20 percent of stations with no Afro-American ownership responded that they attempted to direct programming at Afro-American audiences, 65 percent of stations with Afro-American ownership reported that they did so.   See *id.*, at 13.   Only 10 percent of stations without Hispanic ownership stated that they targeted programming at Hispanic audiences, while 59 percent of stations with Hispanic owners said they did.   See *id.*, at 13, 15.   The CRS concluded:

"[A]n argument can be made that FCC policies that enhanced minority . . . station ownership may have resulted in more minority and other audience targeted programming.   To the degree that increasing minority programming across audience markets is considered adding to programming diversity, then, based on the FCC survey data, an argument can be made that the FCC preference policies contributed, in turn, to programming diversity." *Id.*, at cover page.

Other surveys support the FCC's determination that there is a nexus between ownership and programming.   A University of Wisconsin study found that Afro-American-owned, Afro-American-oriented radio stations have more diverse playlists than white-owned, Afro-American-oriented

suggests that an owner's minority status influences the selection of topics for news coverage and the presentation of editorial viewpoint, especially on matters of particular concern to minorities. "[M]inority ownership does appear to have specific impact on the presentation of minority images in local news,"[32] inasmuch as minority-owned stations tend to devote more news time to topics of minority interest and to avoid racial and ethnic stereotypes in portraying minorities.[33] In addition, studies show that a minority owner is more likely to employ minorities in managerial and other important roles

stations. See J. Jeter, A Comparative Analysis of the Programming Practices of Black-Owned Black-Oriented Radio Stations and White-Owned Black-Oriented Radio Stations 130, 139 (1981) (University of Wisconsin-Madison). See also M. Spitzer, Justifying Minority Preferences in Broadcasting, California Institute of Technology Working Paper No. 718, pp. 19–29 (March 1990) (explaining why minority status of owner might affect programming behavior).

[32] Fife, The Impact of Minority Ownership on Minority Images in Local TV News, in Communications: A Key to Economic and Political Change, Selected Proceedings from the 15th Annual Howard University Communications Conference 113 (1986) (survey of four Standard Metropolitan Statistical Areas); see also M. Fife, The Impact of Minority Ownership on Broadcast News Content: A Multi-Market Study 52 (June 1986) (report submitted to National Association of Broadcasters).

[33] For example, a University of Massachusetts at Boston survey of 3,000 local Boston news stories found a statistically significant difference in the treatment of events, depending on the race of ownership. See K. Johnson, Media Images of Boston's Black Community 16–29 (Jan. 28, 1987) (William Monroe Trotter Institute). A comparison between an Afro-American-owned television station and a white-owned station in Detroit concluded that "the overall mix of topic and location coverage between the two stations is statistically different, and with its higher use of blacks in newsmaker roles and its higher coverage of issues of racial significance, [the Afro-American-owned station's] content does represent a different perspective on news than [that of the white-owned station]." M. Fife, The Impact of Minority Ownership On Broadcast Program Content: A Case Study of WGPR–TV's Local News Content, Report to the National Association of Broadcasters, Office of Research and Planning 45 (Sept. 1979). See also R. Wolseley, The Black Press, U. S. A. 3–4, 11 (2d ed. 1990) (documenting importance of minority ownership).

where they can have an impact on station policies.[34]   If the FCC's equal employment policies "ensure that . . . licensees' programming fairly reflects the tastes and viewpoints of minority groups," *NAACP* v. *FPC*, 425 U. S., at 670, n. 7, it is difficult to deny that minority-owned stations that follow such employment policies on their own will also contribute to diversity.   While we are under no illusion that members of a particular minority group share some cohesive, collective viewpoint, we believe it a legitimate inference for Congress and the Commission to draw that as more minorities gain ownership and policymaking roles in the media, varying perspectives will be more fairly represented on the airwaves. The policies are thus a product of "'analysis'" rather than

---

[34] Afro-American-owned radio stations, for example, have hired Afro-Americans in top management and other important job categories at far higher rates than have white-owned stations, even those with Afro-American-oriented formats.   The same has been true of Hispanic hiring at Hispanic-owned stations, compared to Anglo-owned stations with Spanish-language formats.   See Honig, Relationships Among EEO, Program Service, and Minority Ownership in Broadcast Regulation, in Proceedings from the Tenth Annual Telecommunications Policy Research Conference 88–89 (O. Gandy, P. Espinoza, & J. Ordover eds. 1983).   As of September 1986, half of the 14 Afro-American or Hispanic general managers at TV stations in the United States worked at minority-owned or controlled stations. See National Association of Broadcasters, Minority Broadcasting Facts 9–10, 55–57 (Sept. 1986).   In 1981, 13 of the 15 Spanish-language radio stations in the United States owned by Hispanics also had a majority of Hispanics in management positions, while only a third of Anglo-owned Spanish-language stations had a majority of Hispanic managers, and 42 percent of the Anglo-owned, Spanish-language stations had no Hispanic managers at all.   See Schement & Singleton, The Onus of Minority Ownership: FCC Policy and Spanish-Language Radio, 31 J. Communication 78, 80–81 (1981).   See generally Johnson, *supra*, at 5 ("Many observers agree that the single largest reason for the networks' poor coverage of racial news is related to the racial makeup of the networks' own staffs"); Wimmer, *supra* n. 2, at 426–427 ("[M]inority-owned broadcast outlets tend to hire more minority employees. . . . A policy of minority ownership could, over time, lead to a growth in minority employment, which has been shown to produce minority-responsive programming") (footnotes omitted).

a "'stereotyped reaction'" based on "'[h]abit.'" *Fullilove*, 448 U. S., at 534, n. 4 (STEVENS, J., dissenting) (citation omitted).

Our cases demonstrate that the reasoning employed by the Commission and Congress is permissible. We have recognized, for example, that the fair-cross-section requirement of the Sixth Amendment forbids the exclusion of groups on the basis of such characteristics as race and gender from a jury venire because "[w]ithout that requirement, the State could draw up jury lists in such manner as to produce a pool of prospective jurors disproportionately ill disposed towards one or all classes of defendants, and thus more likely to yield petit juries with similar disposition." *Holland* v. *Illinois*, 493 U. S. 474, 480–481 (1990). It is a small step from this logic to the conclusion that including minorities in the electromagnetic spectrum will be more likely to produce a "fair cross section" of diverse content. Cf. *Duren* v. *Missouri*, 439 U. S. 357, 358–359, 363–364 (1979); *Taylor* v. *Louisiana*, 419 U. S. 522, 531–533 (1975).[35] In addition, many of our voting rights cases operate on the assumption that minorities have particular viewpoints and interests worthy of protection. We have held, for example, that in safeguarding the "'effective exercise of the electoral franchise'" by racial minorities, *United Jewish Organizations of Williamsburgh, Inc.* v. *Carey*, 430 U. S. 144, 159 (1977) (plurality opinion), quoting *Beer* v. *United States*, 425 U. S. 130, 141 (1976), "[t]he permissible use of racial criteria is not confined to eliminating

---

[35] See also *Peters* v. *Kiff*, 407 U. S. 493, 503–504 (1972) (opinion of MARSHALL, J.) ("[W]e are unwilling to make the assumption that the exclusion of Negroes has relevance only for issues involving race. When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable. It is not necessary to assume that the excluded group will consistently vote as a class in order to conclude, as we do, that its exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented").

the effects of past discriminatory districting or apportionment." 430 U. S., at 161. Rather, a State subject to § 5 of the Voting Rights Act of 1965, 79 Stat. 439, as amended, 42 U. S. C. § 1973c, may "deliberately creat[e] or preserv[e] black majorities in particular districts in order to ensure that its reapportionment plan complies with § 5"; "neither the Fourteenth nor the Fifteenth Amendment mandates any *per se* rule against using racial factors in districting and apportionment." 430 U. S., at 161.

### D

We find that the minority ownership policies are in other relevant respects substantially related to the goal of promoting broadcast diversity. First, the Commission adopted and Congress endorsed minority ownership preferences only after long study and painstaking consideration of all available alternatives. See *Fullilove*, 448 U. S., at 463–467 (opinion of Burger, C. J.); *id.*, at 511 (Powell, J., concurring). For many years, the FCC attempted to encourage diversity of programming content without consideration of the race of station owners.[36] When it first addressed the issue, in a 1946

---

[36] The Commission has eschewed direct federal control over discrete programming decisions by radio and television stations. See, *e. g.*, Network Programming Inquiry, Report and Statement of Policy, 25 Fed. Reg. 7293 (1960) ("[W]hile the Commission may inquire of licensees what they have done to determine the needs of the community they propose to serve, the Commission may not impose upon them its private notions of what the public ought to hear"). In order to ensure diversity by means of administrative decree, the Commission would have been required to familiarize itself with the needs of every community and to monitor the broadcast content of every station. Such a scheme likely would have presented insurmountable practical difficulties, in light of the thousands of broadcast outlets in the United States and the myriad local variations in audience tastes and interests. Even were such an ambitious policy of central planning feasible, it would have raised "serious First Amendment issues" if it denied a broadcaster the ability to "carry a particular program or to publish his own views," if it risked "government censorship of a particular program," or if it led to "the official government view dominating public broadcasting." *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 396 (1969);

report entitled Public Service Responsibility of Broadcast Licensees (Blue Book), the Commission stated that although licensees bore primary responsibility for program service, "[i]n issuing and in renewing the licenses of broadcast stations, the Commission [would] give particular consideration to four program service factors relevant to the public interest." *Id.*, at 55.[37]   In 1960, the Commission altered course somewhat, announcing that "the principal ingredient of the licensee's obligation to operate his station in the public interest is the diligent, positive and continuing effort . . . to discover and fulfill the tastes, needs, and desires of his community or service area, for broadcast service."   Network Programming Inquiry, Report and Statement of Policy, 25 Fed. Reg. 7295 (1960).   Licensees were advised that they could meet this obligation in two ways: by canvassing members of the listening public who could receive the station's signal, and by meeting with "leaders in community life . . . and others who bespeak the interests which make up the community." *Id.*, at 7296.

By the late 1960's, it had become obvious that these efforts had failed to produce sufficient diversity in programming. The Kerner Commission, for example, warned that the vari-

cf. *FCC* v. *Sanders Brothers Radio Station*, 309 U. S. 470, 475 (1940). The Commission, with the approval of this Court, has therefore "avoid[ed] unnecessary restrictions on licensee discretion" and has interpreted the Communications Act of 1934 as "seek[ing] to preserve journalistic discretion while promoting the interests of the listening public." *FCC* v. *WNCN Listeners Guild*, 450 U. S. 582, 596 (1981).

[37] One factor was the extent to which a station carried programs unsponsored by commercial advertisers during hours "when the public is awake and listening."   Blue Book 55–56.   The Commission believed that this would expand diversity by permitting the broadcast of less popular programs that would appeal to particular tastes and interests in the listening audience that might otherwise go unserved.   See *id.*, at 12.   Second, the Commission called for local live programs to encourage local self-expression.   See *id.*, at 56.   Third, the Commission expected "program-[ming] devoted to the discussion of public issues." *Ibid.*   The final factor was the amount of advertising aired by the licensee. *Ibid.*

ous elements of the media "have not communicated to whites a feeling for the difficulties and frustrations of being a Negro in the United States. They have not shown understanding or appreciation of—and thus have not communicated—a sense of Negro culture, thought, or history. . . . The world that television and newspapers offer to their black audience is almost totally white . . . ." Report of the National Advisory Commission on Civil Disorders 210 (1968). In response, the FCC promulgated equal employment opportunity regulations, see *supra*, at 554–555, and formal "ascertainment" rules requiring a broadcaster as a condition of license "to ascertain the problems, needs and interests of the residents of his community of license and other areas he undertakes to serve," and to specify "what broadcast matter he proposes to meet those problems, needs and interests." *Primer on Ascertainment of Community Problems by Broadcast Applicants*, 27 F. C. C. 2d 650, 682 (1971).[38] The Commission explained that although it recognized there was "no single answer for all stations," it expected each licensee to devote a "'significant proportion'" of a station's programming to community concerns. *Id.*, at 686 (citation omitted).[39] The Com-

---

[38] The Commission also devised policies to guard against discrimination in programming. For example, it determined that "arbitrar[y] refus[al] to present members of an ethnic group, or their views" in programming, or refusal to present members of such groups "in integrated situations with members of other groups," would constitute a ground for license nonrenewal. *Citizens Communications Center*, 25 F. C. C. 2d 705, 707 (1970).

[39] In addition, the Commission developed nonentertainment guidelines, which called for broadcasters to devote a certain percentage of their programming to nonentertainment subjects such as news, public affairs, public service announcements, and other topics. See *WNCN Listeners Guild*, *supra*, at 598–599, n. 41; *Revision of Programming and Commercialization Policies, Ascertainment Requirements, and Program Log Requirements for Commercial Television Stations*, 98 F. C. C. 2d 1076, 1078 (1984) (hereinafter *Deregulation of Television*); *Deregulation of Radio*, 84 F. C. C. 2d 968, 975 (1981). Applicants proposing less than the guideline amounts of nonentertainment programming could not have their applica-

mission expressly included "minority and ethnic groups" as segments of the community that licensees were expected to consult. See, *e. g., Ascertainment of Community Problems by Broadcast Applicants*, 57 F. C. C. 2d 418, 419, 442 (1976); *Ascertainment of Community Problems by Noncommercial Educational Broadcast Applicants*, 54 F. C. C. 2d 766, 767, 775, 776 (1975). The FCC held that a broadcaster's failure to ascertain and serve the needs of sizable minority groups in its service area was, in itself, a failure of licensee responsibility regardless of any intent to discriminate and was a sufficient ground for the nonrenewal of a license. See, *e. g., Chapman Radio and Television Co.*, 24 F. C. C. 2d 282, 286 (1970). The Commission observed that "[t]he problems of minorities must be taken into consideration by broadcasters in planning their program schedules to meet the needs and interests of the communities they are licensed to serve." *Time-Life Broadcast, Inc.*, 33 F. C. C. 2d 1081, 1093 (1972); see also *Mahoning Valley Broadcasting Corp.*, 39 F. C. C. 2d 52, 58 (1972); *WKBN Broadcasting Corp.*, 30 F. C. C. 2d 958, 970 (1971). Pursuant to this policy, for example, the Commission refused to renew licenses for eight educational stations in Alabama and denied an application for a construction permit for a ninth, all on the ground that the licensee "did not take the trouble to inform itself of the needs and interests of a minority group consisting of 30 percent of the population of the State of Alabama" and that such a failure was "fundamentally irreconcilable with the obligations which the Communications Act places upon those who receive authorizations to use the airwaves." *Alabama Educational Television Comm'n*, 50 F. C. C. 2d 461, 472, 473 (1975), citing *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367 (1969). The Commission's ascertainment policy was not static; in order to facilitate application of the ascertainment requirement, the Commission devised a community leader checklist consisting

---

tions routinely processed by the Commission staff; rather, such applications were brought to the attention of the Commission itself.

of 19 groups and institutions commonly found in local communities, see 57 F. C. C. 2d, at 418–419, and it continued to consider improvements to the ascertainment system. See, *e. g.*, *Amendment of Primers on Ascertainment of Community Problems by Commercial Broadcast Renewal Applicants and Noncommercial Educational Broadcast Applicants, Permittees and Licensees*, 47 Radio Reg. 2d (P&F) 189 (1980).

By 1978, however, the Commission had determined that even these efforts at influencing broadcast content were not effective means of generating adequate programming diversity. The FCC noted that "[w]hile the broadcasting industry has on the whole responded positively to its ascertainment obligations and has made significant strides in its employment practices, we are compelled to observe that the views of racial minorities continue to be inadequately represented in the broadcast media." *Minority Ownership Statement*, 68 F. C. C. 2d, at 980 (footnotes omitted). As support, the Commission cited a report by the United States Commission on Civil Rights, which found that minorities "are underrepresented on network dramatic television programs and on the network news. When they do appear they are frequently seen in token or stereotyped roles." Window Dressing on the Set 3 (Aug. 1977). The FCC concluded that "despite the importance of our equal employment opportunity rules and ascertainment policies in assuring diversity of programming it appears that additional measures are necessary and appropriate. In this regard, the Commission believes that ownership of broadcast facilities by minorities is another significant way of fostering the inclusion of minority views in the area of programming." 68 F. C. C. 2d, at 981; see also *Commission Policy Regarding Advancement of Minority Ownership in Broadcasting*, 92 F. C. C. 2d 849, 850 (1982) ("[I]t became apparent that in order to broaden minority voices and spheres of influence over the airwaves, additional

measures were necessary" beyond the equal employment and ascertainment rules).[40]

In short, the Commission established minority ownership preferences only after long experience demonstrated that race-neutral means could not produce adequate broadcasting diversity.[41] The FCC did not act precipitately in devising the programs we uphold today; to the contrary, the Commission undertook thorough evaluations of its policies *three* times—in 1960, 1971, and 1978—before adopting the minority ownership programs.[42] In endorsing the minority ownership

[40] The Commission recently eliminated its ascertainment policies for commercial radio and television stations, together with its non-entertainment programming guidelines. See *Deregulation of Radio, supra*, at 975–999, reconsideration denied, 87 F. C. C. 2d 797 (1981), rev'd on other grounds *sub nom. Office of Communication of the United Church of Christ* v. *FCC*, 228 U. S. App. D. C. 8, 707 F. 2d 1413 (1983); *Deregulation of Television, supra*, at 1096–1101, reconsideration denied, 104 F. C. C. 2d 358 (1986), remanded on other grounds *sub nom. Action for Children's Television* v. *FCC*, 261 U. S. App. D. C. 253, 821 F. 2d 741 (1987). The Commission found that the ascertainment rules imposed significant burdens on licensees without producing corresponding benefits in terms of responsiveness to community issues. See 98 F. C. C. 2d, at 1098 ("Ascertainment procedures . . . were intended as a means of ensuring that licensees actively discovered the problems, needs and issues facing their communities . . . . Yet, we have no evidence that these procedures have had such an effect") (footnote omitted).

[41] Although the Commission has concluded that "the growth of traditional broadcast facilities" and "the development of new electronic information technologies" have rendered "the fairness doctrine unnecessary," *Report Concerning the General Fairness Doctrine Obligations of Broadcast Licensees*, 102 F. C. C. 2d 143, 197 (1985), the Commission has not made such a finding with respect to its minority ownership policies. To the contrary, the Commission has expressly noted that its decision to abrogate the fairness doctrine does not in its view call into question its "regulations designed to promote diversity." *Syracuse Peace Council (Reconsideration)*, 3 F. C. C. Rcd 2035, 2041, n. 56 (1988).

[42] JUSTICE O'CONNOR offers few race-neutral alternatives to the policies that the FCC has already employed and found wanting. She insists that "[t]he FCC could directly advance its interest by requiring licensees to provide programming that the FCC believes would add to diversity." *Post,*

preferences, Congress agreed with the Commission's assessment that race-neutral alternatives had failed to achieve the necessary programming diversity.[43]

at 622.   But the Commission's efforts to use the ascertainment policy to determine the programming needs of each community and the comparative licensing procedure to provide licensees incentives to address their programming to these needs met with failure.   A system of FCC-mandated "diverse" programming would have suffered the same fate, while introducing new problems as well.   See n. 36, *supra.*

JUSTICE O'CONNOR's proposal that "[t]he FCC . . . evaluate applicants upon their ability to provide, and commitment to offer, whatever programming the FCC believes would reflect underrepresented viewpoints," *post,* at 623, similarly ignores the practical difficulties in determining the "underrepresented viewpoints" of each community.   In addition, JUSTICE O'CONNOR's proposal is in tension with her own view of equal protection. On the one hand, she criticizes the Commission for failing to develop specific definitions of "minority viewpoints" so that it might implement her suggestion.   *Ibid.;* see also *post,* at 629 (noting that the FCC has declined to identify "any *particular* deficiency in the *viewpoints* contained in the broadcast spectrum") (emphasis added).   On the other hand, she implies that any such effort would violate equal protection principles, which she interprets as prohibiting the FCC from "identifying what constitutes a 'Black viewpoint,' an 'Asian viewpoint,' an 'Arab viewpoint,' and so on [and] determining which viewpoints are underrepresented."   *Post,* at 615. In this light, JUSTICE O'CONNOR should perceive as a virtue rather than a vice the FCC's decision to enhance broadcast diversity by means of the minority ownership policies rather than by defining a specific "Black" or "Asian" viewpoint.

JUSTICE O'CONNOR maintains that the FCC should have experimented with "[r]ace-neutral financial and informational measures," *post,* at 623, in order to promote minority ownership.   This suggestion is so vague that it is difficult to evaluate.   In any case, both Congress, see *supra,* at 574 (describing minority financing fund that would have accompanied lottery system), and the Commission considered steps to address directly financial and informational barriers to minority ownership.   After the Minority Ownership Task Force identified the requirement that licensees demonstrate the availability of sufficient funds to construct and operate a station for one year, see *Ultravision Broadcasting Co.,* 1 F. C. C. 2d 544, 547 (1965), as an obstacle to minority ownership, see Task Force Report 11–12, that requirement was subsequently reduced to three months.   See *Finan-*

Moreover, the considered nature of the Commission's judgment in selecting the particular minority ownership policies at issue today is illustrated by the fact that the Commission

*cial Qualifications Standards,* 72 F. C. C. 2d 784 (1979) (television applicants); *Financial Qualifications for Aural Applicants,* 69 F. C. C. 2d 407, 407–408 (1978) (radio applicants). In addition, the Commission noted that minority broadcasters are eligible for assistance from the Small Business Administration and other federal agencies. See Task Force Report 17–22. The Commission also disseminated information about potential minority buyers of broadcast properties. See, *e. g.,* FCC EEO-Minority Enterprise Division, Minority Ownership of Broadcast Facilities: A Report 8–9 (Dec. 1979). Despite these race-neutral initiatives, the Commission concluded in 1982 that the " 'dearth of minority ownership' in the telecommunications industry" remained a matter of "serious concern." *Commission Policy Regarding Advancement of Minority Ownership in Broadcasting,* 92 F. C. C. 2d 849, 852 (1982).

The Commission has continued to employ race-neutral means of promoting broadcast diversity. For example, it has worked to expand the number of broadcast outlets within workable technological limits, see, *e. g., Implementation of BC Docket No. 80–90 To Increase Availability of FM Broadcast Assignments,* 100 F. C. C. 2d 1332 (1985), to develop strict cross-ownership rules, see n. 16, *supra,* and to encourage issue-oriented programming by recognizing a licensee's obligation to present programming responsive to issues facing the community of license. See, *e. g., Television Deregulation,* 104 F. C. C. 2d 358, 359 (1986); *Deregulation of Radio,* 84 F. C. C. 2d, at 982–983. The Commission has nonetheless concluded that these efforts cannot substitute for its minority ownership policies. See, *e. g., id.,* at 977.

[43] Congress followed closely the Commission's efforts to increase programming diversity, see *supra,* at 572–579, including the development of the ascertainment policy. See, *e. g.,* S. Rep. No. 93–1190, pp. 6–7 (1974); Broadcast License Renewal Act: Hearings on S. 16 et al. before the Subcommittee on Communications of the Senate Committee on Commerce, 93d Cong., 2d Sess., pt. 1, p. 63 (1974) (testimony of Sen. Scott); *id.,* at 65 (testimony of Rep. Brown). Congress heard testimony from the chief of the Commission's Mass Media Bureau that the ascertainment rules were "seriously flawed" because they "became highly ritualistic and created unproductive unseemly squabbling over administrative trivia." Broadcast Regulation and Station Ownership: Hearings on H. R. 6122 and H. R. 6134 before the Subcommittee on Telecommunications, Consumer Protection, and Finance of the House Committee on Energy and Commerce, 98th

has rejected other types of minority preferences. For example, the Commission has studied but refused to implement the more expansive alternative of setting aside certain frequencies for minority broadcasters. See *Nighttime Operations on Clear Channels*, 3 F. C. C. Rcd 3597, 3599–3600 (1988); *Deletion of AM Acceptance Criteria*, 102 F. C. C. 2d 548, 555–558 (1985); *Clear Channel Broadcasting*, 78 F. C. C. 2d 1345, reconsideration denied, 83 F. C. C. 2d 216, 218–219 (1980), aff'd *sub nom. Loyola University* v. *FCC*, 216 U. S. App. D. C. 403, 670 F. 2d 1222 (1982). In addition, in a ruling released the day after it adopted the comparative hearing credit and the distress sale preference, the FCC declined to adopt a plan to require 45-day advance public notice before a station could be sold, which had been advocated on the ground that it would ensure minorities a chance to bid on stations that might otherwise be sold to industry insiders without ever coming on the market. See 43 Fed. Reg. 24560 (1978).[44] Soon afterward, the Commission re-

---

Cong., 2d Sess., 165 (1984). Other witnesses testified that the minority ownership policies were adopted "only after specific findings by the Commission that ascertainment policies, and equal opportunity rules fell far short of increasing minority participation in programming and ownership." Minority Ownership of Broadcast Stations: Hearing before the Subcommittee on Communications of the Senate Committee on Commerce, Science, and Transportation, 101st Cong., 1st Sess., p. 157 (1989) (testimony of J. Clay Smith, Jr., National Bar Association). In enacting the lottery statute, Congress explained the "current comparative hearing process" had failed to produce adequate programming diversity and that "[t]he policy of encouraging diversity of information sources is best served . . . by assuring that minority and ethnic groups that have been unable to acquire any significant degree of media ownership are provided an increased opportunity to do so." H. R. Conf. Rep. No. 97–765, p. 43 (1982). Only in this way would "the American public [gain] access to a wider diversity of information sources." *Id.*, at 45.

[44] The proposal was withdrawn after vociferous opposition from broadcasters, who maintained that a notice requirement "would create a burden on stations by causing a significant delay in the time it presently takes to sell a station" and that it might require the disclosure of confidential financial information. 43 Fed. Reg. 24561 (1978).

jected other minority ownership proposals advanced by the Office of Telecommunications Policy and the Department of Commerce that sought to revise the FCC's time brokerage, multiple ownership, and other policies.[45]

The minority ownership policies, furthermore, are aimed directly at the barriers that minorities face in entering the broadcasting industry. The Commission's task force identified as key factors hampering the growth of minority ownership a lack of adequate financing, paucity of information regarding license availability, and broadcast inexperience. See Task Force Report 8–29; Advisory Committee on Alternative Financing for Minority Opportunities in Telecommunications, Final Report, Strategies for Advancing Minority Ownership Opportunities 25–30 (May 1982). The Commission assigned a preference to minority status in the comparative licensing proceeding, reasoning that such an enhancement might help to compensate for a dearth of broadcasting experience. Most license acquisitions, however, are by necessity purchases of existing stations, because only a limited number of new stations are available, and those are often in less desirable markets or on less profitable portions

---

[45] See Public Papers of the Presidents, *supra* n. 4, at 253; *Petition for Issuance of Policy Statement or Notice of Inquiry by National Telecommunications and Information Administration*, 69 F. C. C. 2d 1591, 1593 (1978). The petition advanced such proposals as a blanket exemption for minorities from certain then-existing Commission policies, such as a rule restricting assignments of stations by owners who had held their stations for less than three years, see 47 CFR § 1.597 (1978); multiple ownership regulations that precluded an owner from holding more than one broadcast facility in a given service that overlapped with another's signal, see *id.*, §§ 73.35, 73.240, and 73.636; and the "Top 50" policy, which required a showing of compelling public interest before the same owner was allowed to acquire a third VHF or fourth (either VHF or UHF) television station in the 50 largest television markets. The Commission rejected these proposals on the ground that while minorities might qualify for waivers on a case-by-case basis, a blanket exception for minorities "would be inappropriate." 69 F. C. C. 2d, at 1597.

of spectrum, such as the UHF band.[46]   Congress and the FCC therefore found a need for the minority distress sale policy, which helps to overcome the problem of inadequate access to capital by lowering the sale price and the problem of lack of information by providing existing licensees with an incentive to seek out minority buyers.   The Commission's choice of minority ownership policies thus addressed the very factors it had isolated as being responsible for minority underrepresentation in the broadcast industry.

The minority ownership policies are "appropriately limited in extent and duration, and subject to reassessment and reevaluation by the Congress prior to any extension or reenactment." *Fullilove*, 448 U. S., at 489 (opinion of Burger, C. J.) (footnote omitted).   Although it has underscored emphatically its support for the minority ownership policies, Congress has manifested that support through a series of appropriations Acts of finite duration, thereby ensuring future reevaluations of the need for the minority ownership program as the number of minority broadcasters increases. In addition, Congress has continued to hold hearings on the subject of minority ownership.[47]   The FCC has noted with

---

[46] As of mid-1973, licenses for 66.6 percent of the commercial television stations—and 91.4 percent of the VHF stations—that existed in mid-1989 had already been awarded.   Sixty-eight and one-half percent of the AM and FM radio station licenses authorized by the FCC as of mid-1989 had already been issued by mid-1973, including 85 percent of the AM stations. See Brief for Capital Cities/ABC, Inc., as *Amicus Curiae* in No. 89–453, p. 11, n. 19.   See also n. 2, *supra;* Honig, The FCC and Its Fluctuating Commitment to Minority Ownership of Broadcast Facilities, 27 How. L. J. 859, 875, n. 87 (1984) (reporting 1980 statistics that Afro-Americans "tended to own the least desirable AM properties"—those with the lowest power and highest frequencies, and hence those with the smallest areas of coverage).

[47] See, *e. g.*, Minority Ownership of Broadcast Stations: Hearing before the Subcommittee on Communications of the Senate Committee on Commerce, Science, and Transportation, 101st Cong., 1st Sess. (1989).   See also *supra*, at 578–579.

respect to the minority preferences contained in the lottery statute, 47 U. S. C. § 309(i)(3)(A) (1982 ed.), that Congress instructed the Commission to "report annually on the effect of the preference system and whether it is serving the purposes intended. Congress will be able to further tailor the program based on that information, and may eliminate the preferences when appropriate." *Amendment of Commission's Rules to Allow Selection from Among Certain Competing Applications Using Random Selection or Lotteries Instead of Comparative Hearings*, 93 F. C. C. 2d 952, 974 (1983). Furthermore, there is provision for administrative and judicial review of all Commission decisions, which guarantees both that the minority ownership policies are applied correctly in individual cases,[48] and that there will be frequent

---

[48] As in *Fullilove* v. *Klutznick*, 448 U. S. 448 (1980), the FCC minority preferences are subject to "administrative scrutiny to identify and eliminate from participation" those applicants who are not bona fide. *Id.*, at 487–488. See *Formulation of Policies and Rules Relating to Broadcast Renewal Applicants, Competing Applicants and Other Participants to Comparative Renewal Process and to Prevention of Abuses of the Renewal Process*, 3 F. C. C. Rcd 5179 (1988). The FCC's Review Board, in supervising the comparative hearing process, seeks to detect sham integration credits claimed by all applicants, including minorities. See, *e. g.*, *Silver Springs Communications*, 5 F. C. C. Rcd 469, 479 (1990); *Metroplex Communications, Inc.*, 4 F. C. C. Rcd 8149, 8149–8150, 8159–8160 (1989); *Northampton Media Associates*, 3 F. C. C. Rcd 5164, 5170–5171 (Rev. Bd. 1988); *Washoe Shoshone Broadcasting*, 3 F. C. C. Rcd 3948, 3955 (Rev. Bd. 1988); *Mulkey*, 3 F. C. C. Rcd 590, 590–593 (Rev. Bd. 1988), modified, 4 F. C. C. Rcd 5520, 5520–5521 (1989); *Newton Television Limited*, 3 F. C. C. Rcd 553, 558–559, n. 2 (Rev. Bd. 1988); *Magdelene Gunden Partnership*, 3 F. C. C. Rcd 488, 488–489 (Rev. Bd. 1988); *Tulsa Broadcasting Group*, 2 F. C. C. Rcd 6124, 6129–6130 (Rev. Bd. 1987); *Pacific Television, Ltd.*, 2 F. C. C. Rcd 1101, 1102–1104 (Rev. Bd. 1987), review denied, 3 F. C. C. Rcd 1700 (1988); *Payne Communications, Inc.*, 1 F. C. C. Rcd 1052, 1054–1057 (Rev. Bd. 1986); *N. E. O. Broadcasting Co.*, 103 F. C. C. 2d 1031, 1033 (Rev. Bd. 1986); *Hispanic Owners, Inc.*, 99 F. C. C. 2d 1180, 1190–1191 (Rev. Bd. 1985); *KIST Corp.*, 99 F. C. C. 2d 173, 186–190 (Rev. Bd. 1984), aff'd as modified, 102 F. C. C. 2d 288, 292–293, and n. 11 (1985),

opportunities to revisit the merits of those policies. Congress and the Commission have adopted a policy of minority ownership not as an end in itself, but rather as a means of achieving greater programming diversity. Such a goal carries its own natural limit, for there will be no need for further minority preferences once sufficient diversity has been achieved. The FCC's plan, like the Harvard admissions program discussed in *Bakke*, contains the seed of its own termination. Cf. *Johnson* v. *Transportation Agency, Santa Clara County*, 480 U. S. 616, 640 (1987) (agency's "express commitment to 'attain' a balanced work force" ensures that plan will be of limited duration).

Finally, we do not believe that the minority ownership policies at issue impose impermissible burdens on nonminorities.[49] Although the nonminority challengers in these cases concede that they have not suffered the loss of an already-awarded broadcast license, they claim that they have been handicapped in their ability to obtain one in the first instance. But just as we have determined that "[a]s part of this Nation's dedication to eradicating racial discrimination, innocent persons may be called upon to bear some of the burden of the remedy," *Wygant*, 476 U. S., at 280–281 (opinion of Powell, J.), we similarly find that a congressionally mandated, be-

---

aff'd *sub nom. United American Telecasters, Inc.* v. *FCC*, 255 U. S. App. D. C. 397, 801 F. 2d 1436 (1986).

As evidenced by respondent Shurberg's own unsuccessful attack on the credentials of Astroline, see 278 U. S. App. D. C., at 31, 876 F. 2d, at 906, the FCC also entertains challenges to the bona fide nature of distress sale participants. See *1982 Policy Statement*, 92 F. C. C. 2d, at 855.

[49] Minority broadcasters, both those who obtain their licenses by means of the minority ownership policies and those who do not, are not stigmatized as inferior by the Commission's programs. Audiences do not know a broadcaster's race and have no reason to speculate about how he or she obtained a license; each broadcaster is judged on the merits of his or her programming. Furthermore, minority licensees must satisfy otherwise applicable FCC qualifications requirements. Cf. *Fullilove, supra,* at 521 (MARSHALL, J., concurring in judgment).

nign, race-conscious program that is substantially related to the achievement of an important governmental interest is consistent with equal protection principles so long as it does not impose *undue* burdens on nonminorities. Cf. *Fullilove*, 448 U. S., at 484 (opinion of Burger, C. J.) ("It is not a constitutional defect in this program that it may disappoint the expectations of nonminority firms. When effectuating a limited and properly tailored remedy to cure the effects of prior discrimination, such 'a sharing of the burden' by innocent parties is not impermissible") (citation omitted); *id.*, at 521 (MARSHALL, J., concurring in judgment).

In the context of broadcasting licenses, the burden on nonminorities is slight. The FCC's responsibility is to grant licenses in the "public interest, convenience, or necessity," 47 U. S. C. §§ 307, 309 (1982 ed.), and the limited number of frequencies on the electromagnetic spectrum means that "[n]o one has a First Amendment right to a license." *Red Lion*, 395 U. S., at 389. Applicants have no settled expectation that their applications will be granted without consideration of public interest factors such as minority ownership. Award of a preference in a comparative hearing or transfer of a station in a distress sale thus contravenes "no legitimate firmly rooted expectation[s]" of competing applicants. *Johnson, supra*, at 638.

Respondent Shurberg insists that because the minority distress sale policy operates to exclude nonminority firms completely from consideration in the transfer of certain stations, it is a greater burden than the comparative hearing preference for minorities, which is simply a "plus" factor considered together with other characteristics of the applicants.[50] Cf. *Bakke*, 438 U. S., at 317–318; *Johnson, supra,*

---

[50] Petitioner Metro contends that, in practice, the minority enhancement credit is not part of a multifactor comparison of applicants but rather amounts to a *per se* preference for a minority applicant in a comparative licensing proceeding. But experience has shown that minority ownership does not guarantee that an applicant will prevail. See, *e. g.*, *Radio Jones-*

at 638.    We disagree that the distress sale policy imposes an
undue burden on nonminorities.    By its terms, the policy
may be invoked at the Commission's discretion only with re-
spect to a small fraction of broadcast licenses—those desig-
nated for revocation or renewal hearings to examine basic
qualification issues—and only when the licensee chooses to
sell out at a distress price rather than to go through with the

boro, Inc., 100 F. C. C. 2d 941, 945–946 (1985); Lamprecht, 99 F. C. C. 2d
1219, 1223 (Rev. Bd. 1984), review denied, 3 F. C. C. Rcd 2527 (1988), ap-
peal pending, Lamprecht v. FCC, No. 88–1395 (CADC); Horne Industries,
Inc., 98 F. C. C. 2d 601, 603 (1984); Vacationland Broadcasting Co., 97
F. C. C. 2d 485, 514–517 (Rev. Bd. 1984), modified, 58 Radio Reg. 2d
(P&F) 439 (1985); Las Misiones de Bejar Television Co., 93 F. C. C. 2d
191, 195 (Rev. Bd. 1983), review denied, FCC 84–97 (May 16, 1984); Wa-
ters Broadcasting Corp., 88 F. C. C. 2d 1204, 1211–1212 (Rev. Bd. 1981).
   In many cases cited by Metro, even when the minority applicant pre-
vailed, the enhancement for minority status was not the dispositive factor
in the Commission's decision to award the license.    See, e. g., Silver
Springs Communications, Inc., 5 F. C. C. Rcd 469, 479 (ALJ 1990); Rich-
ardson Broadcasting Group, 4 F. C. C. Rcd 7989, 7999 (ALJ 1989); Pueblo
Radio Broadcasting Service, 4 F. C. C. Rcd 7802, 7812 (ALJ 1989); Pough-
keepsie Broadcasting Limited Partnership, 4 F. C. C. Rcd 6543, 6551, and
n. 4 (ALJ 1989); Barden, 4 F. C. C. Rcd 7043, 7045 (ALJ 1989); Perry
Television, Inc., 4 F. C. C. Rcd 4603, 4618, 4620 (ALJ 1989); Corydon
Broadcasting, Ltd., 4 F. C. C. Rcd 1537, 1539 (ALJ 1989), remanded,
Order of Dec. 6, 1989 (Rev. Bd.); Breaux Bridge Broadcasters Limited
Partnership, 4 F. C. C. Rcd 581, 585 (ALJ 1989); Key Broadcasting Corp.,
3 F. C. C. Rcd 6587, 6600 (ALJ 1988); 62 Broadcasting, Inc., 3 F. C. C.
Rcd 4429, 4450 (ALJ 1988), aff'd, 4 F. C. C. Rcd 1768, 1774 (Rev. Bd.
1989), review denied, 5 F. C. C. Rcd 830 (1990); Gali Communications,
Inc., 2 F. C. C. Rcd 6967, 6994 (ALJ 1987); Bogner Newton Corp., 2
F. C. C. Rcd 4792, 4805 (ALJ 1987); Garcia, 2 F. C. C. Rcd 4166, 4168,
n. 1 (ALJ 1987), aff'd, 3 F. C. C. Rcd 1065 (Rev. Bd.), review denied, 3
F. C. C. Rcd 4767 (1988); Magdalene Gunden Partnership, 2 F. C. C. Rcd
1223, 1238 (ALJ 1987), aff'd, 2 F. C. C. Rcd 5513 (Rev. Bd. 1987), re-
consideration denied, 3 F. C. C. Rcd 488 (Rev. Bd.), review denied, 3
F. C. C. Rcd 7186 (1988); Tulsa Broadcasting Group, 2 F. C. C. Rcd 1149,
1162 (ALJ), aff'd, 2 F. C. C. Rcd 6124 (Rev. Bd. 1987), review denied, 3
F. C. C. Rcd 4541 (1988); Tomko, 2 F. C. C. Rcd 206, 209, n. 3 (ALJ
1987).

hearing. The distress sale policy is not a quota or fixed quantity set-aside. Indeed, the nonminority firm exercises control over whether a distress sale will ever occur at all, because the policy operates only where the qualifications of an existing licensee to continue broadcasting have been designated for hearing and no other applications for the station in question have been filed with the Commission at the time of the designation. See *Clarification of Distress Sale Policy*, 44 Radio Reg. 2d (P&F) 479 (1978). Thus, a nonminority can prevent the distress sale procedures from ever being invoked by filing a competing application in a timely manner.[51]

In practice, distress sales have represented a tiny fraction—less than 0.4 percent—of all broadcast sales since 1979. See Brief for Federal Communications Commission in No. 89–700, p. 44. There have been only 38 distress sales since the policy was commenced in 1978. See A. Barrett, Federal Communications Commission, Minority Employment and Ownership in the Communications Market: What's Ahead in the 90's?, p. 7 (Address to the Bay Area Black

---

[51] Faith Center also held broadcast licenses for three California stations, and in 1978, the FCC designated for a hearing Faith Center's renewal application for its San Bernadino station because of allegations of fraud in connection with over-the-air solicitation for funds and for failure to cooperate with an FCC investigation. Although respondent Shurberg did not file a competing application prior to the Commission's decision to designate for hearing Faith Center's renewal application for its Hartford station, timely filed competing applications against two of Faith Center's California stations prevented their transfer under the distress sale policy. See *Faith Center, Inc.*, 89 F. C. C. 2d 1054 (1982), and *Faith Center, Inc.*, 90 F. C. C. 2d 519 (1982).

Of course, a competitor may be unable to foresee that the FCC might designate a license for a revocation or renewal hearing, and so might neglect to file a competing application in timely fashion. But it is precisely in such circumstances that the minority distress sale policy would least disrupt any of the competitor's settled expectations. From the competitor's perspective, it has been denied an opportunity only at a windfall; it expected the current licensee to continue broadcasting indefinitely and did not anticipate that the license would become available.

Media Conference, San Francisco, Apr. 21, 1990). This means that, on average, only about 0.2 percent of renewal applications filed each year have resulted in distress sales since the policy was commenced in 1978. See 54 FCC Ann. Rep. 33 (1988).[32] Nonminority firms are free to compete for the vast remainder of license opportunities available in a market that contains over 11,000 broadcast properties. Nonminorities can apply for a new station, buy an existing station, file a competing application against a renewal application of an existing station, or seek financial participation in enterprises that qualify for distress sale treatment. See Task Force Report 9–10. The burden on nonminority firms is at least as "relatively light" as that created by the program at issue in *Fullilove*, which set aside for minorities 10 percent of federal funds granted for local public works projects. 448 U. S., at 484 (opinion of Burger, C. J.); see also *id.*, at 485, n. 72.

## III

The Commission's minority ownership policies bear the *imprimatur* of longstanding congressional support and direction and are substantially related to the achievement of the important governmental objective of broadcast diversity. The judgment in No. 89–453 is affirmed, the judgment in

---

[32] Even for troubled licensees, distress sales are relatively rare phenomena; most stations presented with the possibility of license revocation opt *not* to utilize the distress sale policy. Many seek and are granted special relief from the FCC enabling them to transfer the license to another concern as part of a negotiated settlement with the Commission, see *Coalition for the Preservation of Hispanic Broadcasting* v. *FCC*, 282 U. S. App. D. C. 200, 203–204, 893 F. 2d 1349, 1352–1353 (1990); bankrupt licensees can effect a sale for the benefit of innocent creditors under the "*Second Thursday*" doctrine, see *Second Thursday Corp.*, 22 F. C. C. 2d 515, 520–521 (1970), reconsideration granted, 25 F. C. C. 2d 112, 113–115 (1970); *Northwestern Indiana Broadcasting Corp. (WLTH)*, 65 F. C. C. 2d 66, 70–71 (1977); and still others elect to defend their practices at hearing.

No. 89–700 is reversed, and the cases are remanded for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, concurring.

Today the Court squarely rejects the proposition that a governmental decision that rests on a racial classification is never permissible except as a remedy for a past wrong. *Ante,* at 564–565. I endorse this focus on the future benefit, rather than the remedial justification, of such decisions.[1]

I remain convinced, of course, that racial or ethnic characteristics provide a relevant basis for disparate treatment only in extremely rare situations and that it is therefore "especially important that the reasons for any such classification be clearly identified and unquestionably legitimate." *Fullilove* v. *Klutznick,* 448 U. S. 448, 534–535 (1980) (dissenting opinion). The Court's opinion explains how both elements of that standard are satisfied. Specifically, the reason for the classification—the recognized interest in broadcast diversity—is clearly identified and does not imply any judgment concerning the abilities of owners of different races or the merits of different kinds of programming. Neither the favored nor the disfavored class is stigmatized in any way.[2] In addition, the Court demonstrates that these cases fall within the extremely narrow category of governmental decisions for which racial or ethnic heritage may provide a rational basis for differential treatment.[3] The public interest in broadcast diver-

---

[1] See *Richmond* v. *J. A. Croson Co.,* 488 U. S. 469, 511–513 (1989) (STEVENS, J., concurring in part and concurring in judgment); *Wygant* v. *Jackson Board of Education,* 476 U. S. 267, 313–315 (1986) (STEVENS, J., dissenting).

[2] Cf. *Croson,* 488 U. S., at 516–517; *Fullilove,* 448 U. S., at 545, and n. 17.

[3] See *Cleburne* v. *Cleburne Living Center, Inc.,* 473 U. S. 432, 452–454 (1985) (STEVENS, J., concurring) (in examining the "rational basis" for a classification, the "term 'rational,' of course, includes a requirement that an impartial lawmaker could logically believe that the classification would serve a legitimate public purpose that transcends the harm to the members

sity—like the interest in an integrated police force,[4] diversity in the composition of a public school faculty[5] or diversity in the student body of a professional school[6]—is in my view unquestionably legitimate.

Therefore, I join both the opinion and the judgment of the Court.

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE KENNEDY join, dissenting.

At the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens "as *individuals*, not 'as simply components of a racial, religious, sexual or national class.'" *Arizona Governing Comm. for Tax Deferred Annuity and Deferred Compensation Plans* v. *Norris*, 463 U. S. 1073, 1083 (1983). Social scientists may debate how peoples' thoughts and behavior reflect their background, but the Constitution provides that the Government may not allocate benefits and burdens among individuals based on the assumption that race or ethnicity determines how they act or think. To uphold the challenged programs, the Court departs from these fundamental principles and from our traditional requirement that racial classifications are permissible only if necessary and narrowly tailored to achieve a compelling interest. This departure marks a renewed toleration of racial classifications and a repudiation of our recent affirmation that the Constitution's equal protection guarantees extend equally to all citi-

---

of the disadvantaged class"); *Michael M.* v. *Superior Court of Sonoma County*, 450 U. S. 464, 497, n. 4 (1981) (STEVENS, J., dissenting) (discussing the level of scrutiny appropriate in equal protection cases).

[4] See *Wygant*, 476 U. S., at 314 (STEVENS, J., dissenting).

[5] See *id.*, at 315–316. See also JUSTICE O'CONNOR's opinion concurring in part and concurring in the judgment in *Wygant*, recognizing that the "goal of providing 'role models' discussed by the courts below should not be confused with the very different goal of promoting racial diversity among the faculty." *Id.*, at 288, n.

[6] See Justice Powell's opinion announcing the judgment in *Regents of University of California* v. *Bakke*, 438 U. S. 265, 311–319 (1978).

zens. The Court's application of a lessened equal protection standard to congressional actions finds no support in our cases or in the Constitution. I respectfully dissent.

I

As we recognized last Term, the Constitution requires that the Court apply a strict standard of scrutiny to evaluate racial classifications such as those contained in the challenged FCC distress sale and comparative licensing policies. See *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469 (1989); see also *Bolling* v. *Sharpe*, 347 U. S. 497 (1954). "Strict scrutiny" requires that, to be upheld, racial classifications must be determined to be necessary and narrowly tailored to achieve a compelling state interest. The Court abandons this traditional safeguard against discrimination for a lower standard of review, and in practice applies a standard like that applicable to routine legislation. Yet the Government's different treatment of citizens according to race is no routine concern. This Court's precedents in no way justify the Court's marked departure from our traditional treatment of race classifications and its conclusion that different equal protection principles apply to these federal actions.

In both the challenged policies, the Federal Communications Commission (FCC) provides benefits to some members of our society and denies benefits to others based on race or ethnicity. Except in the narrowest of circumstances, the Constitution bars such racial classifications as a denial to particular individuals, of any race or ethnicity, of "the equal protection of the laws." U. S. Const., Amdt. 14, § 1; cf. *Croson, supra*, at 493–494. The dangers of such classifications are clear. They endorse race-based reasoning and the conception of a Nation divided into racial blocs, thus contributing to an escalation of racial hostility and conflict. See *Croson, supra*, at 493–494; *Korematsu* v. *United States*, 323 U. S. 214, 240 (1944) (Murphy, J., dissenting) (upholding treatment of individual based on inference from race is "to destroy the

dignity of the individual and to encourage and open the door to discriminatory actions against other minority groups in the passions of tomorrow"). Such policies may embody stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts—their very worth as citizens—according to a criterion barred to the Government by history and the Constitution. Accord, *Mississippi University for Women* v. *Hogan*, 458 U. S. 718, 725–726 (1982). Racial classifications, whether providing benefits to or burdening particular racial or ethnic groups, may stigmatize those groups singled out for different treatment and may create considerable tension with the Nation's widely shared commitment to evaluating individuals upon their individual merit. Cf. *Regents of University of California* v. *Bakke*, 438 U. S. 265, 358–362 (1978) (opinion of BRENNAN, J.). "Because racial characteristics so seldom provide a relevant basis for disparate treatment, and because classifications based on race are potentially so harmful to the entire body politic, it is especially important that the reasons for any such classifications be clearly identified and unquestionably legitimate." *Fullilove* v. *Klutznick*, 448 U. S. 448, 533–535 (1980) (STEVENS, J., dissenting) (footnotes omitted).

The Constitution's guarantee of equal protection binds the Federal Government as it does the States, and no lower level of scrutiny applies to the Federal Government's use of race classifications. In *Bolling* v. *Sharpe, supra,* the companion case to *Brown* v. *Board of Education,* 347 U. S. 483 (1954), the Court held that equal protection principles embedded in the Fifth Amendment's Due Process Clause prohibited the Federal Government from maintaining racially segregated schools in the District of Columbia: "[I]t would be unthinkable that the same Constitution would impose a lesser duty on the Federal Government." *Id.,* at 500. Consistent with this view, the Court has repeatedly indicated that "the reach of the equal protection guarantee of the Fifth Amendment is coextensive with that of the Fourteenth." *United States* v.

*Paradise,* 480 U. S. 149, 166, n. 16 (1987) (plurality opinion) (considering remedial race classification); *id.,* at 196 (O'CON-NOR, J., dissenting); see also, *e. g., Buckley* v. *Valeo,* 424 U. S. 1, 93 (1976); *Weinberger* v. *Wiesenfeld,* 420 U. S. 636, 638, n. 2 (1975).

Nor does the congressional role in prolonging the FCC's policies justify any lower level of scrutiny. As with all instances of judicial review of federal legislation, the Court does not lightly set aside the considered judgment of a coordinate branch. Nonetheless, the respect due a coordinate branch yields neither less vigilance in defense of equal protection principles nor any corresponding diminution of the standard of review. In *Weinberger* v. *Wiesenfeld,* for example, the Court upheld a widower's equal protection challenge to a provision of the Social Security Act, found the assertedly benign congressional purpose to be illegitimate, and noted that "[t]his Court's approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment." 420 U. S., at 638, n. 2. The Court has not varied its standard of review when entertaining other equal protection challenges to congressional measures. See, *e. g., Heckler* v. *Mathews,* 465 U. S. 728 (1984); *Califano* v. *Webster,* 430 U. S. 313 (1977) *(per curiam); Califano* v. *Goldfarb,* 430 U. S. 199, 210–211 (1977) (traditional equal protection standard applies despite deference to congressional benefit determinations) (opinion of BRENNAN, J.); *Buckley* v. *Valeo, supra,* at 93; *Frontiero* v. *Richardson,* 411 U. S. 677, 684–691 (1973) (opinion of BRENNAN, J.). And *Bolling* v. *Sharpe, supra,* itself involved extensive congressional regulation of the segregated District of Columbia public schools.

Congress has considerable latitude, presenting special concerns for judicial review, when it exercises its "unique remedial powers . . . under § 5 of the Fourteenth Amendment," see *Croson, supra,* at 488 (opinion of O'CONNOR, J.), but this case does not implicate those powers. Section 5 empowers

Congress to act respecting the States, and of course this case concerns only the administration of federal programs by federal officials. Section 5 provides to Congress the "power to enforce, by appropriate legislation, the provisions of this article," which in part provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U. S. Const., Amdt. 14, § 1. Reflecting the Fourteenth Amendment's "dramatic change in the balance between congressional and state power over matters of race," *Croson,* 488 U. S., at 490 (opinion of O'CONNOR, J.), that section provides to Congress a particular, structural role in the oversight of certain of the States' actions. See *id.,* at 488–491, 504; *Hogan, supra,* at 732 (§ 5 grants power to enforce Amendment "'to secure . . . equal protection of the laws against State denial or invasion,'" quoting *Ex parte Virginia,* 100 U. S. 339, 346 (1880)); *Fullilove, supra,* at 476–478, 483–484.

The Court asserts that *Fullilove* supports its novel application of intermediate scrutiny to "benign" race conscious measures adopted by Congress. *Ante,* at 564. Three reasons defeat this claim. First, *Fullilove* concerned an exercise of Congress' powers under § 5 of the Fourteenth Amendment. In *Fullilove,* the Court reviewed an Act of Congress that had required States to set aside a percentage of federal construction funds for certain minority-owned businesses to remedy past discrimination in the award of construction contracts. Although the various opinions in *Fullilove* referred to several sources of congressional authority, the opinions make clear that it was § 5 that led the Court to apply a different form of review to the challenged program. See, *e. g.,* 448 U. S., at 483 (opinion of Burger, C. J., joined by WHITE, J., and Powell, J.) ("[I]n no organ of government, state or federal, does there repose a more comprehensive remedial power than in the Congress, expressly charged by the Constitution with competence and authority to enforce equal protection guarantees"); *id.,* at 508–510, 516 (Powell, J., concur-

ring). Last Term, *Croson* resolved any doubt that might remain regarding this point. In *Croson*, we invalidated a local set-aside for minority contractors. We distinguished *Fullilove*, in which we upheld a similar set-aside enacted by Congress, on the ground that in *Fullilove* "Congress was exercising its powers under § 5 of the Fourteenth Amendment." *Croson*, 488 U. S., at 504 (opinion of the Court); *id.*, at 490 (opinion of O'CONNOR, J., joined by REHNQUIST, C. J., and WHITE, J.). *Croson* indicated that the decision in *Fullilove* turned on "the unique remedial powers of Congress under § 5," *id.*, at 488 (opinion of O'CONNOR, J.), and that the latitude afforded Congress in identifying and redressing past discrimination rested on § 5's "specific constitutional mandate to enforce the dictates of the Fourteenth Amendment." *Id.*, at 490. JUSTICE KENNEDY's concurrence in *Croson* likewise provides the majority with no support, for it questioned whether the Court should, as it had in *Fullilove*, afford any particular latitude even to measures undertaken pursuant to § 5. See *id.*, at 518.

Second, *Fullilove* applies at most only to congressional measures that seek to remedy identified past discrimination. The Court upheld the challenged measures in *Fullilove* only because Congress had identified discrimination that had particularly affected the construction industry and had carefully constructed corresponding remedial measures. See *Fullilove*, 448 U. S., at 456–467, 480–489 (opinion of Burger, C. J.); *id.*, at 498–499 (Powell, J., concurring). *Fullilove* indicated that careful review was essential to ensure that Congress acted solely for remedial rather than other, illegitimate purposes. See *id.*, at 486–487 (opinion of Burger, C. J.); *id.*, at 498–499 (Powell, J., concurring). The FCC and Congress are clearly not acting for any remedial purpose, see *infra*, at 611–612, and the Court today expressly extends its standard to racial classifications that are not remedial in any sense. See *ante*, at 564–565. This case does not present "a considered decision of the Congress and the President," *Fullilove*,

*supra,* at 473; nor does it present a remedial effort or exercise of § 5 powers.

Finally, even if *Fullilove* applied outside a remedial exercise of Congress' § 5 power, it would not support today's adoption of the intermediate standard of review proffered by JUSTICE MARSHALL, but rejected, in *Fullilove.* Under his suggested standard, the Government's use of racial classifications need only be "'substantially related to achievement'" of important governmental interests. *Ante,* at 565. Although the Court correctly observes that a majority did not apply strict scrutiny, six Members of the Court rejected intermediate scrutiny in favor of some more stringent form of review. Three Members of the Court applied strict scrutiny. See 448 U. S., at 496 (Powell, J., concurring) (challenged statute "employs a racial classification that is constitutionally prohibited unless it is a necessary means of advancing a compelling governmental interest"); *id.,* at 498 ("means selected must be narrowly drawn"); *id.,* at 523 (Stewart, J., joined by REHNQUIST, J., dissenting). Chief Justice Burger's opinion, joined by JUSTICE WHITE and Justice Powell, declined to adopt a particular standard of review but indicated that the Court must conduct "a most searching examination," *id.,* at 491, and that courts must ensure that "any congressional program that employs racial or ethnic criteria to accomplish the objective of remedying the present effects of past discrimination is narrowly tailored to the achievement of that goal." *Id.,* at 480. JUSTICE STEVENS indicated that "[r]acial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." *Id.,* at 537–538 (dissenting opinion). Even JUSTICE MARSHALL's opinion concurring in the judgment, joined by JUSTICE BRENNAN and JUSTICE BLACKMUN, undermines the Court's course today: That opinion expressly drew its lower standard of review from the plurality opinion in *Regents of University of California* v. *Bakke,* 438 U. S. 265 (1978), a case that did not involve con-

gressional action, and stated that the appropriate standard of review for the congressional measure challenged in *Fullilove* "is the same as that under the Fourteenth Amendment." 448 U. S., at 517–518, n. 2 (internal quotation omitted). And, of course, *Fullilove* preceded our determination in *Croson* that strict scrutiny applies to preferences that favor members of minority groups, including challenges considered under the Fourteenth Amendment.

The guarantee of equal protection extends to each citizen, regardless of race: The Federal Government, like the States, may not "deny to any person within its jurisdiction the equal protection of the laws." As we observed only last Term in *Croson*, "[a]bsent searching judicial inquiry into the justification for such race-based measures, there is simply no way of determining what classifications are 'benign' or 'remedial' and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics." 488 U. S., at 493 (opinion of O'CONNOR, J.); see also *id.*, at 500, 494 ("[T]he standard of review under the Equal Protection Clause is not dependent on the race of those burdened or benefited by a particular classification").

The Court's reliance on "benign racial classifications," *ante*, at 564, is particularly troubling. " 'Benign' racial classification" is a contradiction in terms. Governmental distinctions among citizens based on race or ethnicity, even in the rare circumstances permitted by our cases, exact costs and carry with them substantial dangers. To the person denied an opportunity or right based on race, the classification is hardly benign. The right to equal protection of the laws is a personal right, see *Shelley* v. *Kraemer*, 334 U. S. 1, 22 (1948), securing to *each* individual an immunity from treatment predicated simply on membership in a particular racial or ethnic group. The Court's emphasis on "benign racial classifications" suggests confidence in its ability to distinguish good from harmful governmental uses of racial criteria. History should teach greater humility. Untethered to nar-

rowly confined remedial notions, "benign" carries with it no independent meaning, but reflects only acceptance of the current generation's conclusion that a politically acceptable burden, imposed on particular citizens on the basis of race, is reasonable. The Court provides no basis for determining when a racial classification fails to be "benevolent." By expressly distinguishing "benign" from remedial race-conscious measures, the Court leaves the distinct possibility that any racial measure found to be substantially related to an important governmental objective is also, by definition, "benign." See *ante*, at 564–565. Depending on the preference of the moment, those racial distinctions might be directed expressly or in practice at any racial or ethnic group. We are a Nation not of black and white alone, but one teeming with divergent communities knitted together by various traditions and carried forth, above all, by individuals. Upon that basis, we are governed by one Constitution, providing a single guarantee of equal protection, one that extends equally to all citizens.

This dispute regarding the appropriate standard of review may strike some as a lawyers' quibble over words, but it is not. The standard of review establishes whether and when the Court and Constitution allow the Government to employ racial classifications. A lower standard signals that the Government may resort to racial distinctions more readily. The Court's departure from our cases is disturbing enough, but more disturbing still is the renewed toleration of racial classifications that its new standard of review embodies.

## II

Our history reveals that the most blatant forms of discrimination have been visited upon some members of the racial and ethnic groups identified in the challenged programs. Many have lacked the opportunity to share in the Nation's wealth and to participate in its commercial enterprises. It is undisputed that minority participation in the broadcasting industry falls markedly below the demographic representation

of those groups, see, *e. g.*, Congressional Research Service, Minority Broadcast Station Ownership and Broadcast Programming: Is There a Nexus? 42 (June 29, 1988) (minority owners possess an interest in 13.3 percent of stations and a controlling interest in 3.5 percent of stations), and this shortfall may be traced in part to the discrimination and the patterns of exclusion that have widely affected our society. As a Nation we aspire to create a society untouched by that history of exclusion, and to ensure that equality defines all citizens' daily experience and opportunities as well as the protection afforded to them under law.

For these reasons, and despite the harms that may attend the Government's use of racial classifications, we have repeatedly recognized that the Government possesses a compelling interest in remedying the effects of identified race discrimination. We subject even racial classifications claimed to be remedial to strict scrutiny, however, to ensure that the Government in fact employs any race-conscious measures to further this remedial interest and employs them only when, and no more broadly than, the interest demands. See, *e. g.*, *Croson, supra*, at 493–495, 498–502; *Wygant* v. *Jackson Bd. of Ed.*, 476 U. S. 267 (1986) (plurality opinion). The FCC or Congress may yet conclude after suitable examination that narrowly tailored race-conscious measures are required to remedy discrimination that may be identified in the allocation of broadcasting licenses. Such measures are clearly within the Government's power.

Yet it is equally clear that the policies challenged in these cases were not designed as remedial measures and are in no sense narrowly tailored to remedy identified discrimination. The FCC appropriately concedes that its policies embodied no remedial purpose, Tr. of Oral Arg. 40–42, and has disclaimed the possibility that discrimination infected the allocation of licenses. The congressional action at most simply endorsed a policy designed to further the interest in achieving diverse programming. Even if the appropriations

measure could transform the purpose of the challenged policies, its text reveals no remedial purpose, and the accompanying legislative material confirms that Congress acted upon the same diversity rationale that led the FCC to formulate the challenged policies. See S. Rep. No. 100–182, p. 76 (1987). The Court refers to the bare suggestion, contained in a Report addressing different legislation passed in 1982, that "past inequities" have led to "underrepresentation of minorities in the media of mass communications, as it has adversely affected their participation in other sectors of the economy as well." H. R. Conf. Rep. No. 97–765, p. 43 (1982); *ante*, at 566. This statement indicates nothing whatever about the purpose of the relevant appropriations measures, identifies no discrimination in the broadcasting industry, and would not sufficiently identify discrimination even if Congress were acting pursuant to its § 5 powers. Cf. *Fullilove*, 448 U. S., at 456–467 (opinion of Burger, C. J.) (surveying identification of discrimination affecting contracting opportunities); *id.*, at 502–506 (Powell, J., concurring). The Court evaluates the policies only as measures designed to increase programming diversity. *Ante*, at 566–568. I agree that the racial classifications cannot be upheld as remedial measures.

### III

Under the appropriate standard, strict scrutiny, only a compelling interest may support the Government's use of racial classifications. Modern equal protection doctrine has recognized only one such interest: remedying the effects of racial discrimination. The interest in increasing the diversity of broadcast viewpoints is clearly not a compelling interest. It is simply too amorphous, too insubstantial, and too unrelated to any legitimate basis for employing racial classifications. The Court does not claim otherwise. Rather, it employs its novel standard and claims that this asserted interest need only be, and is, "important." This conclusion twice compounds the Court's initial error of reducing its level

of scrutiny of a racial classification. First, it too casually extends the justifications that might support racial classifications, beyond that of remedying past discrimination. We have recognized that racial classifications are so harmful that "[u]nless they are strictly reserved for remedial settings, they may in fact promote notions of racial inferiority and lead to a politics of racial hostility." *Croson*, 488 U. S., at 493. As Chief Justice Burger warned in *Fullilove:* "The history of governmental tolerance of practices using racial or ethnic criteria for the purpose or with the effect of imposing an invidious discrimination must alert us to the deleterious effects of even benign racial or ethnic classifications when they stray from narrow remedial justifications." 448 U. S., at 486–487. Second, it has initiated this departure by endorsing an insubstantial interest, one that is certainly insufficiently weighty to justify tolerance of the Government's distinctions among citizens based on race and ethnicity. This endorsement trivializes the constitutional command to guard against such discrimination and has loosed a potentially far-reaching principle disturbingly at odds with our traditional equal protection doctrine.

An interest capable of justifying race-conscious measures must be sufficiently specific and verifiable, such that it supports only limited and carefully defined uses of racial classifications. In *Croson*, we held that an interest in remedying societal discrimination cannot be considered compelling. See 488 U. S., at 505 (because the city of Richmond had presented *no* evidence of identified discrimination, it had "failed to demonstrate a compelling interest in apportioning public contracting opportunities on the basis of race"). We determined that a "generalized assertion" of past discrimination "has no logical stopping point" and would support unconstrained uses of race classifications. See *id.*, at 498 (internal quotation marks omitted). In *Wygant*, we rejected the asserted interest in "providing minority role models for [a public school system's] minority students, as an attempt to allevi-

ate the effects of societal discrimination," 476 U. S., at 274 (plurality opinion), because "[s]ocietal discrimination, without more, is too amorphous a basis for imposing a racially classified remedy" and would allow "remedies that are ageless in their reach into the past, and timeless in their ability to affect the future." *Id.*, at 276. Both cases condemned those interests because they would allow distribution of goods essentially according to the demographic representation of particular racial and ethnic groups. See *Croson*, *supra*, at 498, 505–506, 507; *Wygant*, 476 U. S., at 276 (plurality opinion).

The asserted interest in these cases suffers from the same defects. The interest is certainly amorphous: The FCC and the majority of this Court understandably do not suggest how one would define or measure a particular viewpoint that might be associated with race, or even how one would assess the diversity of broadcast viewpoints. Like the vague assertion of societal discrimination, a claim of insufficiently diverse broadcasting viewpoints might be used to justify equally unconstrained racial preferences, linked to nothing other than proportional representation of various races. And the interest would support indefinite use of racial classifications, employed first to obtain the appropriate mixture of racial views and then to ensure that the broadcasting spectrum continues to reflect that mixture. We cannot deem to be constitutionally adequate an interest that would support measures that amount to the core constitutional violation of "outright racial balancing." *Croson, supra*, at 507.

The asserted interest would justify discrimination against members of any group found to contribute to an insufficiently diverse broadcasting spectrum, including those groups currently favored. In *Wygant*, we rejected as insufficiently weighty the interest in achieving role models in public schools, in part because that rationale could as readily be used to limit the hiring of teachers who belonged to particular minority groups. See *Wygant, supra*, at 275–276 (plurality

opinion). The FCC's claimed interest could similarly justify limitations on minority members' participation in broadcasting. It would be unwise to depend upon the Court's restriction of its holding to "benign" measures to forestall this result. Divorced from any remedial purpose and otherwise undefined, "benign" means only what shifting fashions and changing politics deem acceptable. Members of any racial or ethnic group, whether now preferred under the FCC's policies or not, may find themselves politically out of fashion and subject to disadvantageous but "benign" discrimination.

Under the majority's holding, the FCC may also advance its asserted interest in viewpoint diversity by identifying what constitutes a "black viewpoint," an "Asian viewpoint," an "Arab viewpoint," and so on; determining which viewpoints are underrepresented; and then using that determination to mandate particular programming or to deny licenses to those deemed by virtue of their race or ethnicity less likely to present the favored views. Indeed, the FCC has, if taken at its word, essentially pursued this course, albeit without making express its reasons for choosing to favor particular groups or for concluding that the broadcasting spectrum is insufficiently diverse. See *Statement of Policy on Minority Ownership of Broadcasting Facilities*, 68 F. C. C. 2d 979 (1978) *(1978 Policy Statement)*.

We should not accept as adequate for equal protection purposes an interest unrelated to race, yet capable of supporting measures so difficult to distinguish from proscribed discrimination. The remedial interest may support race classifications because that interest is necessarily related to past racial discrimination; yet the interest in diversity of viewpoints provides no legitimate, much less important, reason to employ race classifications apart from generalizations impermissibly equating race with thoughts and behavior. And it will prove impossible to distinguish naked preferences for members of particular races from preferences for members of particular races because they possess certain valued

views: No matter what its purpose, the Government will be able to claim that it has favored certain persons for their ability, stemming from race, to contribute distinctive views or perspectives.

Even considered as other than a justification for using race classifications, the asserted interest in viewpoint diversity falls short of being weighty enough. The Court has recognized an interest in obtaining diverse broadcasting viewpoints as a legitimate basis for the FCC, acting pursuant to its "public interest" statutory mandate, to adopt limited measures to increase the number of competing licensees and to encourage licensees to present varied views on issues of public concern. See, *e. g., FCC* v. *National Citizens Committee for Broadcasting*, 436 U. S. 775 (1978); *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367 (1969); *United States* v. *Storer Broadcasting Co.*, 351 U. S. 192 (1956); *Associated Press* v. *United States*, 326 U. S. 1 (1945); *National Broadcasting Co.* v. *United States*, 319 U. S. 190 (1943). We have also concluded that these measures do not run afoul of the First Amendment's usual prohibition of Government regulation of the marketplace of ideas, in part because First Amendment concerns support limited but inevitable Government regulation of the peculiarly constrained broadcasting spectrum. See, *e. g., Red Lion, supra,* at 389–390. But the conclusion that measures adopted to further the interest in diversity of broadcasting viewpoints are neither beyond the FCC's statutory authority nor contrary to the First Amendment hardly establishes the interest as important for equal protection purposes.

The FCC's extension of the asserted interest in diversity of views in these cases presents, at the very least, an unsettled First Amendment issue. The FCC has concluded that the American broadcasting public receives the incorrect mix of ideas and claims to have adopted the challenged policies to supplement programming content with a particular set of views. Although we have approved limited measures de-

signed to increase information and views generally, the Court has never upheld a broadcasting measure designed to amplify a distinct set of views or the views of a particular class of speakers. Indeed, the Court has suggested that the First Amendment prohibits allocating licenses to further such ends. See *National Broadcasting Co.* v. *United States, supra,* at 226 ("But Congress did not authorize the Commission to choose among [license] applicants upon the basis of their political, economic or social views, or upon any other capricious basis. If it did, or if the Commission by these Regulations proposed a choice among applicants upon some such basis, the [First Amendment] issue before us would be wholly different"). Even if an interest is determined to be legitimate in one context, it does not suddenly become important enough to justify distinctions based on race.

## IV

Our traditional equal protection doctrine requires, in addition to a compelling state interest, that the Government's chosen means be necessary to accomplish, and narrowly tailored to further, the asserted interest. See *Wygant,* 476 U. S., at 274 (plurality opinion); *Palmore* v. *Sidoti,* 466 U. S. 429, 432–433 (1984). This element of strict scrutiny is designed to "ensur[e] that the means chosen 'fit' [the] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Croson,* 488 U. S., at 493 (opinion of O'CONNOR, J.). The chosen means, resting as they do on stereotyping and so indirectly furthering the asserted end, could not plausibly be deemed narrowly tailored. The Court instead finds the racial classifications to be "substantially related" to achieving the Government's interest, *ante,* at 569, a far less rigorous fit requirement. The FCC's policies fail even this requirement.

## A

The FCC claims to advance its asserted interest in diverse viewpoints by singling out race and ethnicity as peculiarly linked to distinct views that require enhancement. The FCC's choice to employ a racial criterion embodies the related notions that a particular and distinct viewpoint inheres in certain racial groups, and that a particular applicant, by virtue of race or ethnicity alone, is more valued than other applicants because "likely to provide [that] distinct perspective." Brief for FCC in No. 89–453, p. 17; see *1978 Policy Statement*, 68 F. C. C. 2d, at 981 (policies seek "representation of minority viewpoints in programming"); Brief for FCC in No. 89–700, p. 20 (current ownership structure creates programming deficient in "minorities['] . . . tastes and viewpoints"). The policies directly equate race with belief and behavior, for they establish race as a necessary and sufficient condition of securing the preference. The FCC's chosen means rest on the "premise that differences in race, or in the color of a person's skin, reflect real differences that are relevant to a person's right to share in the blessings of a free society. [T]hat premise is utterly irrational and repugnant to the principles of a free and democratic society." *Wygant*, *supra*, at 316 (STEVENS, J., dissenting) (internal quotation marks omitted; citation omitted). The policies impermissibly value individuals because they presume that persons think in a manner associated with their race. See *Steele* v. *FCC*, 248 U. S. App. D. C. 279, 285, 770 F. 2d 1192, 1198 (1985) (minority preference contrary to "one of our most cherished constitutional and societal principles . . . that an individual's tastes, beliefs, and abilities should be assessed on their own merits rather than by categorizing that individual as a member of a racial group presumed to think and behave in a particular way"), vacated, No. 84–1176 (Oct. 31, 1985), remanded (CADC, Oct. 9, 1986).

The FCC assumes a particularly strong correlation of race and behavior. The FCC justifies its conclusion that insuffi-

ciently diverse viewpoints are broadcast by reference to the percentage of minority-owned stations. This assumption is correct only to the extent that minority-owned stations provide the desired additional views, and that stations owned by individuals not favored by the preferences cannot, or at least do not, broadcast underrepresented programming. Additionally, the FCC's focus on ownership to improve programming assumes that preferences linked to race are so strong that they will dictate the owner's behavior in operating the station, overcoming the owner's personal inclinations and regard for the market. This strong link between race and behavior, especially when mediated by market forces, is the assumption that Justice Powell rejected in his discussion of health care service in *Bakke*. See 438 U. S., at 310–311. In that case, the state medical school argued that it could prefer members of minority groups because they were more likely to serve communities particularly needing medical care. Justice Powell rejected this rationale, concluding that the assumption was unsupported and that such individual choices could not be presumed from ethnicity or race. *Ibid.*

The majority addresses this point by arguing that the equation of race with distinct views and behavior is not "impermissible" in these particular cases. *Ante*, at 579. Apart from placing undue faith in the Government and courts' ability to distinguish "good" from "bad" stereotypes, this reasoning repudiates essential equal protection principles that prohibit racial generalizations. The Court embraces the FCC's reasoning that an applicant's race will likely indicate that the applicant possesses a distinct perspective, but notes that the correlation of race to behavior is "not a rigid assumption about how minority owners will behave in every case." *Ibid.* The corollary to this notion is plain: Individuals of unfavored racial and ethnic backgrounds are unlikely to possess the unique experiences and background that contribute to viewpoint diversity. Both the reasoning and its corollary reveal but disregard what is objectionable about a stereo-

type: The racial generalization inevitably does not apply to certain individuals, and those persons may legitimately claim that they have been judged according to their race rather than upon a relevant criterion. See *Los Angeles Dept. of Water and Power* v. *Manhart*, 435 U. S. 702, 708 (1978) ("Even a true generalization about the class is an insufficient reason for disqualifying an individual to whom the generalization does not apply"). Similarly disturbing is the majority's reasoning that different treatment on the basis of race is permissible because efficacious "in the aggregate." *Ante*, at 579. In *Wiesenfeld*, we rejected similar reasoning: "Obviously, the notion that men are more likely than women to be the primary supporters of their spouses and children is not entirely without empirical support. But such a gender-based generalization cannot suffice to justify the denigration of the efforts of women who do work and whose earnings contribute significantly to their families' support." 420 U. S., at 645 (citation omitted). Similarly in these cases, even if the Court's equation of race and programming viewpoint has some empirical basis, equal protection principles prohibit the Government from relying upon that basis to employ racial classifications. See *Manhart*, *supra*, at 709 ("Practices that classify employees in terms of religion, race, or sex tend to preserve traditional assumptions about groups rather than thoughtful scrutiny of individuals"). This reliance on the "aggregate" and on probabilities confirms that the Court has abandoned heightened scrutiny, which requires a direct rather than approximate fit of means to ends. We would not tolerate the Government's claim that hiring persons of a particular race leads to better service "in the aggregate," and we should not accept as legitimate the FCC's claim in these cases that members of certain races will provide superior programming, even if "in the aggregate." The Constitution's text, our cases, and our Nation's history foreclose such premises.

## B

Moreover, the FCC's selective focus on viewpoints associated with race illustrates a particular tailoring difficulty. The asserted interest is in advancing the Nation's different "social, political, esthetic, moral, and other ideas and experiences," *Red Lion*, 395 U. S., at 390, yet of all the varied traditions and ideas shared among our citizens, the FCC has sought to amplify only those particular views it identifies through the classifications most suspect under equal protection doctrine. Even if distinct views could be associated with particular ethnic and racial groups, focusing on this particular aspect of the Nation's views calls into question the Government's genuine commitment to its asserted interest. See *Bakke*, 438 U. S., at 314 (opinion of Powell, J.) (race-conscious measures might be employed to further diversity only if race were one of many aspects of background sought and considered relevant to achieving a diverse student body).

Our equal protection doctrine governing intermediate review indicates that the Government may not use race and ethnicity as "a 'proxy for other, more germane bases of classification.'" *Hogan*, 458 U. S., at 726, quoting *Craig* v. *Boren*, 429 U. S. 190, 198 (1976). The FCC has used race as a proxy for whatever views it believes to be underrepresented in the broadcasting spectrum. This reflexive or unthinking use of a suspect classification is the hallmark of an unconstitutional policy. See, *e. g., Wengler* v. *Druggists Mutual Ins. Co.*, 446 U. S. 142, 151–152 (1980); *Craig, supra*, at 198–199; *Wiesenfeld, supra*, at 643–645. The ill fit of means to ends is manifest. The policy is overinclusive: Many members of a particular racial or ethnic group will have no interest in advancing the views the FCC believes to be underrepresented, or will find them utterly foreign. The policy is underinclusive: It awards no preference to disfavored individuals who may be particularly well versed in and committed to presenting those views. The FCC has failed to implement a case-by-case determination, and that failure is particularly unjus-

tified when individualized hearings already occur, as in the comparative licensing process. See *Orr* v. *Orr*, 440 U. S. 268, 281 (1979). Even in the remedial context, we have required that the Government adopt means to ensure that the award of a particular preference advances the asserted interest. In *Fullilove*, even reviewing an exercise of § 5 powers, the Court upheld the challenged set-aside only because it contained a waiver provision that ensured that the program served its remedial function in particular cases. See *Fullilove*, 448 U. S., at 487–488 (opinion of Burger, C. J.); see also *Croson*, 488 U. S., at 488–489 (opinion of O'CONNOR, J.).

Moreover, the FCC's programs cannot survive even intermediate scrutiny because race-neutral and untried means of directly accomplishing the governmental interest are readily available. The FCC could directly advance its interest by requiring licensees to provide programming that the FCC believes would add to diversity. The interest the FCC asserts is in programming diversity, yet in adopting the challenged policies, the FCC expressly disclaimed having attempted *any* direct efforts to achieve its asserted goal. See *1978 Policy Statement*, 68 F. C. C. 2d, at 981; *ante*, at 584–585, n. 36. The Court suggests that administrative convenience excuses this failure, *ibid.*, yet intermediate scrutiny bars the Government from relying upon that excuse to avoid measures that directly further the asserted interest. See, *e. g.*, *Orr* v. *Orr*, *supra*, at 281; *Craig* v. *Boren*, *supra*, at 198. The FCC and the Court suggest that First Amendment interests in some manner should exempt the FCC from employing this direct, race-neutral means to achieve its asserted interest. They essentially argue that we may bend our equal protection principles to avoid more readily apparent harm to our First Amendment values. But the FCC cannot have it both ways: Either the First Amendment bars the FCC from seeking to accomplish indirectly what it may not accomplish directly; or the FCC may pursue the goal, but must do so in a manner that comports with equal protection principles. And if the

FCC can direct programming in any fashion, it must employ that direct means before resorting to indirect race-conscious means.

Other race-neutral means also exist, and all are at least as direct as the FCC's racial classifications. The FCC could evaluate applicants upon their ability to provide, and commitment to offer, whatever programming the FCC believes would reflect underrepresented viewpoints. If the FCC truly seeks diverse programming rather than allocation of goods to persons of particular racial backgrounds, it has little excuse to look to racial background rather than programming to further the programming interest. Additionally, if the FCC believes that certain persons by virtue of their unique experiences will contribute as owners to more diverse broadcasting, the FCC could simply favor applicants whose particular background indicates that they will add to the diversity of programming, rather than rely solely upon suspect classifications. Also, race-neutral means exist to allow access to the broadcasting industry for those persons excluded for financial and related reasons. The Court reasons that various minority preferences, including those reflected in the distress sale, overcome barriers of information, experience, and financing that inhibit minority ownership. *Ante*, at 593–594. Race-neutral financial and informational measures most directly reduce financial and informational barriers.

The FCC could develop an effective ascertainment policy, one guaranteeing programming that reflects underrepresented viewpoints. The Court's discussion of alternatives nearly exclusively focuses on the FCC's ascertainment policy. *Ante*, at 585–589. Yet that policy applied only to existing licensees, addressed not viewpoints but issues of concern to often relatively homogeneous local communities, and, by the FCC's own admission, was toothless and ineffective. According to the FCC, the ascertainment policies altered programming little more than the market already did, and provided "no guarantee that once a concern is ascertained by

formal or informal means, programming responsive to that concern will be presented." *Commercial TV Stations*, 98 F. C. C. 2d 1076, 1098 (1984), reconsideration denied, 104 F. C. C. 2d 358 (1986), remanded on other grounds *sub nom. Action for Children's Television* v. *FCC*, 261 U. S. App. D. C. 253, 821 F. 2d 741 (1987); see also 98 F. C. C. 2d, at 1098–1101. Unsurprisingly, the FCC has concluded that this limited ascertainment policy has not proved to be effective, and has eliminated it throughout most media. See *id.*, at 1097–1101; *id.*, at 1099, and nn. 78–80 (surveying proceedings abandoning ascertainment requirements).

The FCC has posited a relative absence of "minority viewpoints," yet it has never suggested what those views might be or what other viewpoints might be absent from the broadcasting spectrum. It has never identified any particular deficiency in programming diversity that should be the subject of greater programming or that necessitates racial classifications.

The FCC has never attempted to assess what alternatives to racial classifications might prove effective. The *1978 Policy Statement* referred to only two alternatives that the Commission had undertaken: a minority hiring policy and the ascertainment policy. 68 F. C. C. 2d, at 979–980. Relying on ownership statistics and cursory evaluations of what viewpoints the broadcasting spectrum contained, the FCC asserted that insufficient programming diversity existed and that racial classifications were necessary. *Id.*, at 980–981. Not until 1986 did the FCC attempt to determine the nature of the viewpoints that might be underrepresented or to determine whether effective race-neutral measures might achieve the FCC's asserted interest. See, *e. g., Notice of Inquiry on Racial, Ethnic, or Gender Classifications*, 1 F. C. C. Rcd 1315 (1986), modified, 2 F. C. C. Rcd 2377 (1987). The FCC solicited comment about a range of potential race-neutral alternatives: It asked what race-neutral means might effectively increase program diversity,

whether it should require an individualized showing of ability to contribute to program diversity, whether it should allow nonminority members to demonstrate their ability to contribute to diverse programming, and whether it should select applicants based on demonstrated commitment to particular issues rather than according to race. See 1 F. C. C. Rcd, at 1318. It was this inquiry, of course, that the congressional appropriations measures halted. See Continuing Appropriations Act for Fiscal Year 1988, Pub. L. 100–202, 101 Stat. 1329. Thus the record is clear: The FCC has never determined that it has any need to resort to racial classifications to achieve its asserted interest, and it has employed race-conscious means before adopting readily available race-neutral, alternative means.

The FCC seeks to avoid the tailoring difficulties by focusing on minority ownership rather than the asserted interest in diversity of broadcast viewpoints. The Constitution clearly prohibits allocating valuable goods such as broadcast licenses simply on the basis of race. See *Bakke*, 438 U. S., at 307 (opinion of Powell, J.). Yet the FCC refers to the lack of minority ownership of stations to support the existence of a lack of diversity of viewpoints, and has fitted its programs to increase ownership. See *1978 Policy Statement, supra; Commission Policy Regarding Advancement of Minority Ownership in Broadcasting*, 92 F. C. C. 2d 849 (1982). This repeated focus on ownership supports the inference that the FCC seeks to allocate licenses based on race, an impermissible end, rather than to increase diversity of viewpoints, the asserted interest. And this justification that links the use of race preferences to minority ownership rather than to diversity of viewpoints ensures that the FCC's programs, like that at issue in *Croson*, "cannot be said to be narrowly tailored to any goal, except perhaps outright racial balancing." *Croson*, 488 U. S., at 507.

## . C

Even apart from these tailoring defects in the FCC's policies, one particular flaw underscores the Government's ill fit of means to ends. The FCC's policies assume, and rely upon, the existence of a tightly bound "nexus" between the owners' race and the resulting programming. The Court's lengthy discussion of this issue, *ante*, at 569–579, purports to establish only that some relation exists between owners' race and programming: *i. e.*, that the FCC's choice to focus on allocation of licenses is rationally related to the asserted end. The Court understandably makes no stronger claims, because the evidence provides no support and because the requisite deference would so obviously abandon heightened scrutiny. For argument's sake, we can grant that the Court's review of congressional hearings and social science studies establishes the existence of some rational nexus. But even assuming that to be true, the Court's discussion does not begin to establish that the programs are directly and substantially related to the interest in diverse programming. That equal protection issue turns on the degree owners' race is related to programming, rather than whether any relation exists. To the extent that the FCC cannot show the nexus to be nearly complete, that failure confirms that the chosen means do not directly advance the asserted interest, that the policies rest instead upon illegitimate stereotypes, and that individualized determinations must replace the FCC's use of race as a proxy for the desired programming.

Three difficulties suggest that the nexus between owners' race and programming is considerably less than substantial. First, the market shapes programming to a tremendous extent. Members of minority groups who own licenses might be thought, like other owners, to seek to broadcast programs that will attract and retain audiences, rather than programs that reflect the owner's tastes and preferences. See *Winter Park Communications, Inc.* v. *FCC,* 277 U. S. App. D. C. 134, 145–148, 873 F. 2d 347, 358–361 (1989) (case below) (Wil-

liams, J., concurring in part and dissenting in part) (surveying evidence suggesting programming geared to audience taste). Second, station owners have only limited control over the content of programming. The distress sale presents a particularly acute difficulty of this sort. Unlike the comparative licensing program, the distress sale policy provides preferences to minority owners who neither intend nor desire to manage the station in any respect. See *ante*, at 557–558; *Commission Policy Regarding Advancement of Minority Ownership in Broadcasting, supra.* Whatever distinct programming may attend the race of an owner actively involved in managing the station, an absentee owner would have far less effect on programming.

Third, the FCC had absolutely no factual basis for the nexus when it adopted the policies and has since established none to support its existence. Until the mid-1970's, the FCC believed that its public interest mandate and 1965 Policy Statement precluded it from awarding preference based on race and ethnicity, and instead required applicants to demonstrate particular entitlement to an advantage in a comparative hearing. *Policy Statement on Comparative Broadcast Hearings,* 1 F. C. C. 2d 393 (1965). See, *e. g., Mid-Florida Television Corp.,* 33 F. C. C. 2d 1 (Rev. Bd.), review denied, 37 F. C. C. 2d 559 (1972), rev'd, *TV 9, Inc.* v. *FCC,* 161 U. S. App. D. C. 349, 495 F. 2d 929 (1973), cert. denied, 419 U. S. 986 (1974). The Court of Appeals for the District of Columbia Circuit rejected the FCC's position on statutory grounds. See *TV 9,* 161 U. S. App. D. C., at 356–358, 495 F. 2d, at 936–938. The court rejected the FCC's arguments that "the Communications Act, like the Constitution, is color-blind," and that a race preference was incompatible with the FCC's governing statute. *Ibid.* Instead, based on nothing other than its conception of the public interest, that court required that an applicant's membership in a minority group be presumed to lead to greater diversity of programming. *Id.,* at 357–358, 495 F. 2d, at

937–938; see *Garrett* v. *FCC*, 168 U. S. App. D. C. 266, 272–273, 513 F. 2d 1056, 1062–1063 (1975). Principally relying on the panel's presumed nexus between race and programming, the FCC in its *1978 Policy Statement* acquiesced and established the policies challenged in these cases. See *1978 Policy Statement, supra,* at 981–982. In the mid-1980's, the FCC, prompted by this Court's decisions indicating that a factual predicate must be established to support use of race classifications, unanimously sought to examine whether, and to what extent, any nexus existed between an owner's race and programming. See *Notice of Inquiry on Racial, Ethnic, or Gender Classifications,* 1 F. C. C. Rcd 1315 (1986), modified, 2 F. C. C. Rcd 2377 (1987). As the Chairman of the FCC explained to Congress:

> "To the extent that heightened scrutiny requires certain factual predicates, we discovered that notwithstanding our statements in the past regarding the assumed nexus between minority or female ownership and program diversity, a factual predicate has never been established.
>
> "For example, the Commission has at no time examined whether there is a nexus between a broadcast owner's race or gender and program diversity, either on a case-by-case basis or generically. We had no reason to, because the court in *TV 9* told us we could, indeed must, assume such a nexus." Minority-Owned Broadcast Stations, Hearing on H. R. 5373 before the Subcommittee on Telecommunications, Consumer Protection, and Finance of the House Committee on Energy and Commerce, 99th Cong., 2d Sess., 16 (1986).

Through the appropriations measures, Congress barred the FCC's attempt to initiate that examination. See Continuing Appropriations Act for Fiscal Year 1988, 101 Stat. 1329–31.

Even apart from the limited nature of the Court's claims, little can be discerned from the congressional action. First, the Court's survey does not purport to establish that the

FCC or Congress has identified any particular deficiency in the viewpoints contained in the broadcast spectrum. Second, no degree of congressional endorsement may transform the equation of race with behavior and thoughts into a permissible basis of governmental action. Even the most express and lavishly documented congressional declaration that members of certain races will as owners produce distinct and superior programming would not allow the Government to employ such reasoning to allocate benefits and burdens among citizens on that basis. Third, we should hesitate before accepting as definitive any declaration regarding even the existence of a nexus. The two legislative Reports that claim some nexus to exist refer to sources that provide no support for the proposition. See S. Rep. No. 100–182, p. 76 (1987); H. R. Conf. Rep. No. 97–765, p. 43 (1982). Congress, through appropriations measures, sought to foreclose examination of an issue that the FCC believed to be entirely unresolved. See Continuing Appropriations Act for Fiscal Year 1988, *supra*. Especially where Congress rejects the considered judgment of the executive officials possessing particular expertise regarding the matter in issue, courts are hardly bound to accept the congressional declaration. See, *e. g.*, *Rostker* v. *Goldberg*, 453 U. S. 57, 83–85 (1981) (WHITE, J., dissenting). Additionally, the FCC created the challenged policies. Congress has, through the appropriations process, frozen those policies in place by preventing the FCC from reexamining or altering them. That congressional action does not amount to an endorsement of the reasoning and empirical claims originally asserted and then abandoned by the FCC, and does not reflect the same considered judgment embodied in measures crafted through the legislative process and subject to the hearings and deliberation accompanying substantive legislation. Cf. *TVA* v. *Hill*, 437 U. S. 153 (1978); *Andrus* v. *Sierra Club*, 442 U. S. 347, 359–361 (1979).

## D

Finally, the Government cannot employ race classifications that unduly burden individuals who are not members of the favored racial and ethnic groups. See, *e. g.*, *Wygant*, 476 U. S., at 280–281 (plurality opinion). The challenged policies fail this independent requirement, as well as the other constitutional requirements. The comparative licensing and distress sale programs provide the eventual licensee with an exceptionally valuable property and with a rare and unique opportunity to serve the local community. The distress sale imposes a particularly significant burden. The FCC has at base created a specialized market reserved exclusively for minority controlled applicants. There is no more rigid quota than a 100% set-aside. This fact is not altered by the observation, see *ante*, at 598–599, that the FCC and the seller have some discretion over whether stations may be sold through the distress program. For the would-be purchaser or person who seeks to compete for the station, that opportunity depends entirely upon race or ethnicity. The Court's argument that the distress sale allocates only a small percentage of all license sales, *ante*, at 599, also misses the mark. This argument readily supports complete preferences and avoids scrutiny of particular programs: It is no response to a person denied admission at one school, or discharged from one job, solely on the basis of race, that other schools or employers do not discriminate.

The comparative licensing program, too, imposes a significant burden. The Court's emphasis on the multifactor process should not be confused with the claim that the preference is in some sense a minor one. It is not. The basic nonrace criteria are not difficult to meet, and, given the sums at stake, applicants have every incentive to structure their ownership arrangement to prevail in the comparative process. Applicants cannot alter their race, of course, and race is clearly the dispositive factor in a substantial percentage of comparative proceedings. Petitioner Metro asserts that

race is overwhelmingly the dispositive factor. In reply, the FCC admits that it has not assessed the operation of its own program, Brief for FCC in No. 89–453, p. 39, and the Court notes only that "minority ownership does not guarantee that an applicant will prevail." *Ante*, at 597–598, n. 50.

In sum, the FCC has not met its burden even under the Court's test that approves of racial classifications that are substantially related to an important governmental objective. Of course, the programs even more clearly fail the strict scrutiny that should be applied. The Court has determined, in essence, that Congress and all federal agencies are exempted, to some ill-defined but significant degree, from the Constitution's equal protection requirements. This break with our precedents greatly undermines equal protection guarantees and permits distinctions among citizens based on race and ethnicity which the Constitution clearly forbids. I respectfully dissent.

JUSTICE KENNEDY, with whom JUSTICE SCALIA joins, dissenting.

Almost 100 years ago in *Plessy* v. *Ferguson*, 163 U. S. 537 (1896), this Court upheld a government-sponsored race-conscious measure, a Louisiana law that required "equal but separate accommodations" for "white" and "colored" railroad passengers. The Court asked whether the measures were "reasonable," and it stated that "[i]n determining the question of reasonableness, [the legislature] is at liberty to act with reference to the established usages, customs and traditions of the people, and with a view to the promotion of their comfort." *Id.*, at 550. The *Plessy* Court concluded that the "race-conscious measures" it reviewed were reasonable because they served the governmental interest of increasing the riding pleasure of railroad passengers. The fundamental errors in *Plessy*, its standard of review and its validation of rank racial insult by the State, distorted the law for six decades before the Court announced its apparent demise in *Brown* v. *Board of Education*, 347 U. S. 483 (1954).

*Plessy*'s standard of review and its explication have disturbing parallels to today's majority opinion that should warn us something is amiss here.

Today the Court grants Congress latitude to employ "benign race-conscious measures . . . [that] are not . . . designed to compensate victims of past governmental or societal discrimination," but that "serve important governmental objectives . . . and are substantially related to achievement of those objectives." *Ante*, at 564–565. The interest the Court accepts to uphold the race-conscious measures of the Federal Communications Commission (Commission or FCC) is "broadcast diversity." Furthering that interest, we are told, is worth the cost of discriminating among citizens on the basis of race because it will increase the listening pleasure of media audiences. In upholding this preference, the majority exhumes *Plessy*'s deferential approach to racial classifications. The Court abandons even the broad societal remedial justification for racial preferences once advocated by JUSTICE MARSHALL, *e. g.*, *Regents of University of California* v. *Bakke*, 438 U. S. 265, 396 (1978) (separate opinion), and now will allow the use of racial classifications by Congress untied to any goal of addressing the effects of past race discrimination. All that need be shown under the new approach, which until now only JUSTICE STEVENS had advanced, *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469, 511 (1989) (opinion concurring in part and concurring in judgment); *Wygant* v. *Jackson Board of Education*, 476 U. S. 267, 313 (1986) (dissenting opinion), is that the future effect of discriminating among citizens on the basis of race will advance some "important" governmental interest.

Once the Government takes the step, which itself should be forbidden, of enacting into law the stereotypical assumption that the race of owners is linked to broadcast content, it follows a path that becomes ever more tortuous. It must decide which races to favor. While the Court repeatedly refers to the preferences as favoring "minorities," *ante*, at 554, and

purports to evaluate the burdens imposed on "nonminorities," *ante*, at 596, it must be emphasized that the discriminatory policies upheld today operate to exclude the many racial and ethnic *minorities* that have not made the Commission's list. The enumeration of the races to be protected is borrowed from a remedial statute, but since the remedial rationale must be disavowed in order to sustain the policy, the race classifications bear scant relation to the asserted governmental interest. The Court's reasoning provides little justification for welcoming the return of racial classifications to our Nation's laws.[1]

I cannot agree with the Court that the Constitution permits the Government to discriminate among its citizens on the basis of race in order to serve interests so trivial as "broadcast diversity." In abandoning strict scrutiny to endorse this interest the Court turns back the clock on the level of scrutiny applicable to federal race-conscious measures. Even strict scrutiny may not have sufficed to invalidate early race-based laws of most doubtful validity, as we learned in *Korematsu* v. *United States*, 323 U. S. 214 (1944). But the relaxed standard of review embraced today would validate that case, and any number of future racial classifications the

---

[1]The Court fails to address the difficulties, both practical and constitutional, with the task of defining members of racial groups that its decision will require. The Commission, for example, has found it necessary to trace an applicant's family history to 1492 to conclude that the applicant was "Hispanic" for purposes of a minority tax certificate policy. See *Storer Broadcasting Co.*, 87 F. C. C. 2d 190 (1981). I agree that "the very attempt to define with precision a beneficiary's qualifying racial characteristics is repugnant to our constitutional ideals." *Fullilove* v. *Klutznick*, 448 U. S. 448, 534, n. 5 (1980) (STEVENS, J., dissenting); see *id.*, at 531–532 (Stewart, J., dissenting). "If the National Government is to make a serious effort to define racial classes by criteria that can be administered objectively, it must study precedents such as the First Regulation to the Reichs Citizenship Law of November 14, 1935, translated in 4 Nazi Conspiracy and Aggression, Document No. 1417-PS, pp. 8–9 (1946)." *Id.*, at 534, n. 5. Other examples are available. See Population Registration Act No. 30 of 1950, Statutes of the Republic of South Africa 71 (1985).

Government may find useful. Strict scrutiny is the surest test the Court has yet devised for holding true to the constitutional command of racial equality. Under our modern precedents, as JUSTICE O'CONNOR explains, strict scrutiny must be applied to this statute. The approach taken to congressional measures under § 5 of the Fourteenth Amendment in *Fullilove* v. *Klutznick*, 448 U. S. 448 (1980), even assuming its validity, see *Croson, supra,* at 518 (opinion of KENNEDY, J.), is not applicable to this case.

As to other exercises of congressional power, our cases following *Bolling* v. *Sharpe,* 347 U. S. 497 (1954), such as *Weinberger* v. *Wiesenfeld,* 420 U. S. 636, 638, n. 2 (1975), until they were in effect overruled today, had held that the Congress is constrained in its actions by the same standard applicable to the States: strict scrutiny of all racial classifications. The majority cannot achieve its goal of upholding the quotas here under the rigor of this standard, and so must devise an intermediate test. JUSTICE O'CONNOR demonstrates that this statute could not survive even intermediate scrutiny as it had been understood until today. The majority simply says otherwise, providing little reasoning or real attention to past cases in its opinion of 49 pages.

The Court insists that the programs under review are "benign." JUSTICE STEVENS agrees. "[T]he reason for the classification—the recognized interest in broadcast diversity—is clearly identified and does not imply any judgment concerning the abilities of owners of different races or the merits of different kinds of programming. Neither the favored nor the disfavored class is stigmatized in any way." *Ante,* at 601 (STEVENS, J., concurring).[2] A fundamental error

---

[2]JUSTICE STEVENS' assertion that the FCC policy "does not imply any judgment concerning . . . the merits of different kinds of programming," *ante,* at 601, is curious. If this policy, which is explicitly aimed at the ultimate goal of altering programming content, does not "imply any judgment concerning . . . the merits of different kinds of programming," then it is

of the *Plessy* Court was its similar confidence in its ability to identify "benign" discrimination: "We consider the underlying fallacy of the plaintiff's argument to consist in the assumption that the enforced separation of the two races stamps the colored race with a badge of inferiority. If this be so, it is not by reason of anything found in the act, but solely because the colored race chooses to put that construction upon it." 163 U. S., at 551. Although the majority is "confident" that it can determine when racial discrimination is benign, *ante*, at 564–565, n. 12, it offers no explanation as to how it will do so.

The Court also justifies its result on the ground that "Congress and the Commission have determined that there may be important differences between the broadcasting practices of minority owners and those of their nonminority counterparts." *Ante*, at 580. The Court is all too correct that the type of reasoning employed by the Commission and Congress is not novel. Policies of racial separation and preference are almost always justified as benign, even when it is clear to any sensible observer that they are not. The following statement, for example, would fit well among those offered to uphold the Commission's racial preference policy: "The policy is not based on any concept of superiority or inferiority, but merely on the fact that people differ, particularly in their group associations, loyalties, cultures, outlook, modes of life and standards of development." See South Africa and the Rule of Law 37 (1968) (official publication of the South African Government).

The history of governmental reliance on race demonstrates that racial policies defended as benign often are not seen that way by the individuals affected by them. Today's dismissive statements aside, a plan of the type sustained here may impose "stigma on its supposed beneficiaries," *Croson*, 488

---

difficult to see how the FCC's policy serves *any* governmental interest, let alone substantially furthers an important one.

U. S., at 516–517 (opinion of STEVENS, J.), and "foster intolerance and antagonism against the entire membership of the favored classes," *Fullilove*, 448 U. S., at 547 (STEVENS, J., dissenting). Although the majority disclaims it, the FCC policy seems based on the demeaning notion that members of the defined racial groups ascribe to certain "minority views" that must be different from those of other citizens. Special preferences also can foster the view that members of the favored groups are inherently less able to compete on their own. And, rightly or wrongly, special preference programs often are perceived as targets for exploitation by opportunists who seek to take advantage of monetary rewards without advancing the stated policy of minority inclusion.[3]

The perceptions of the excluded class must also be weighed, with attention to the cardinal rule that our Constitution protects each citizen as an individual, not as a member of a group. There is the danger that the "stereotypical thinking" that prompts policies such as the FCC rules here "stigmatizes the disadvantaged class with the unproven charge of past racial discrimination." *Croson*, 488 U. S., at 516 (opinion of STEVENS, J.). Whether or not such programs can be described as "remedial," the message conveyed is that it is acceptable to harm a member of the group excluded from the benefit or privilege. If this is to be considered acceptable under the Constitution, there are various possible explanations. One is that the group disadvantaged by the preference should feel no stigma at all, because racial preferences address not the evil of intentional discrimination but the continuing unconscious use of stereotypes that disad-

---

[3] The record in one of these two cases indicates that Astroline Communications Company, the beneficiary of the distress sale policy in this case, had a total capitalization of approximately $24 million. Its sole minority principal was a Hispanic-American who held 21% of Astroline's overall equity and 71% of its voting equity. His total cash contribution was $210. See App. in No. 89–700, pp. 68–69.

vantage minority groups. But this is not a proposition that the many citizens, who to their knowledge "have never discriminated against anyone on the basis of race," *ibid.*, will find easy to accept.

Another explanation might be that the stigma imposed upon the excluded class should be overlooked, either because past wrongs are so grievous that the disfavored class must bear collective blame, or because individual harms are simply irrelevant in the face of efforts to compensate for racial inequalities. But these are not premises that the Court even appears willing to address in its analysis. Until the Court is candid about the existence of stigma imposed by racial preferences on both affected classes, candid about the "animosity and discontent" they create, *Fullilove, supra*, at 532–533 (STEVENS, J., dissenting), and open about defending a theory that explains why the cost of this stigma is worth bearing and why it can consist with the Constitution, no basis can be shown for today's casual abandonment of strict scrutiny.

Though the racial composition of this Nation is far more diverse than the first Justice Harlan foresaw, his warning in dissent is now all the more apposite: "The destinies of the two races, in this country, are indissolubly linked together, and the interests of both require that the common government of all shall not permit the seeds of race hate to be planted under the sanction of law." *Plessy*, 163 U. S., at 560 (dissenting opinion). Perhaps the Court can succeed in its assumed role of case-by-case arbiter of when it is desirable and benign for the Government to disfavor some citizens and favor others based on the color of their skin. Perhaps the tolerance and decency to which our people aspire will let the disfavored rise above hostility and the favored escape condescension. But history suggests much peril in this enterprise, and so the Constitution forbids us to undertake it. I regret that after a

century of judicial opinions we interpret the Constitution to do no more than move us from "separate but equal" to "unequal but benign."